**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ANTONIO DEVARGAS, as Personal Representative
of the Estate of Carmela DeVargas, deceased, et. al.,**

**Plaintiffs,**

v.                                                        **Civil Action No. 21-CV-271 RB-SCY**

**THE BOARD OF COUNTY COMMISSIONERS
FOR SANTA FE COUNTY, et. al. ,**

**Defendants.**

**PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS' MOTION TO DISMISS**

**I.  Introduction**

Carmela DeVargas was booked into the Santa Fe County Jail on September 19, 2019 as a pre-trial detainee for an alleged probation violation.  She was a 34-year-old mother of two who suffered from Opioid Use Disorder ("OUD") but was otherwise healthy. From the day she was in the custody of Defendants until the time she was released from the custody of Defendant Santa Fe County on her death bed, Ms. DeVargas was subjected to a shocking pattern of medical and physical abuse that ultimately resulted in her tragic death at age 34.

As described fully in Plaintiff's First Amended Complaint ("FAC") and in this Response, Defendants have knowingly maintained an extremely dangerous facility for housing pre-trial detainees and allowed it to continue in this condition for years.  The Santa Fe County Jail is filthy, rife with dangerous bacteria (MRSA), rampant with dangerous illicit drugs, providing substandard medical care, and denying basic treatment for the many opioid users who end up there for a period of time.  The treatment of Ms. DeVargas was only one of the latest act in a history of inadequate treatment of inmates at the County Jail that goes back at least to 2003 when

1

the United States Department of Justice ("DOJ") commenced an investigation into the inadequate medical treatment and unsanitary conditions at the jail that resulted in a 2008 agreement wherein Defendant County agreed to meet DOJ standards.  Since at least 2012, Defendants have failed to meet the terms of that Agreement and the subsequent history of grossly inadequate medical treatment and filthy conditions has resulted in numerous deaths over the past eight years.  This case is about one of these victims of Defendants' deliberate indifference.

Shortly after her admission to Defendant Santa Fe County's Jail, Ms. DeVargas became increasingly ill. On October 1, she reported stomach pains but was not treated or even examined. By October 4, she had a fever, continuing abdominal pain, and flank pain. Because Defendant Olivares knew she was an IV drug user, these symptoms should have raised concerns by Defendants about the obvious risk that she had of a serious infection, including endocarditis and/or an epidural abscess, potentially deadly sequela of endocarditis. But Defendant's medical staff were deliberately indifferent to her deteriorating condition and made no effort to ascertain the source of the infection. No blood work was done. Repeatedly Defendant Olivares did not bother to examine her. No diagnosis was made of her condition. FAC, ¶¶60-64.

Ms. DeVargas's condition quickly deteriorated further. By October 17, she was in terrible pain that reduced her to tears. Her chest pain was so severe that she could not lie on her back. She had difficulty breathing. She was taken to the Jail Medical Unit around 2:00 a.m. on October 18.  She was given nothing to treat her serious medical condition other than ibuprofen. She could not stand because her pain was so severe  Defendant Olivares saw her briefly that afternoon and merely ordered that she be taken for an x-ray in four days. No blood work was done. Her condition worsened on October 19, but Olivares again chose not to see her and did not order blood work. In the early morning hours of October 20, she had to be taken to the hospital.  Upon ar-

rival, her blood count was grossly abnormal.  She was diagnosed with a sepsis infection. The Emergency Room doctor noted that as an IV drug user she was at high risk for infection, endocarditis and epidural abscess – none of which was diagnosed or treated by Defendants when she was in the Santa Fe County Jail.  She was placed on oxygen that day, intubated on October 21, and because of her rampant infection lost the use of and feeling in her limbs, becoming quadriplegic, by October 24. FAC, ¶¶68-81, 83-84, 86, 94-96.  She had "difuse epidural abscess", "sepsis, secondary to MRSA" and brain stem infarction.  She was transferred to UNM Hospital where she died ten days later. FAC, ¶¶98, 99.

Ms. DeVargas died from sepsis which was secondary to the MRSA infection she received at the Jail, most likely from a dirty needle she used to self-medicate herself in order to try and curb the pain of opiate withdrawal or directly from the filthy and dangerous conditions that Defendants have allowed to exist at the Jail.  Ms. DeVargas died as a direct result of the grossly inadequate medical treatment she received at the jail and from the filthy and dangerous conditions Defendants knowingly allow to exist there.  FAC, ¶112(b).

Moreover, during that time Defendants subjected her to physical and emotional abuse without any legitimate basis.  On the day she arrived at the jail, and without any medical justification, Defendants used unreasonable force on Ms. DeVargas to make her inhale Narcan which sent her into painful withdrawal for which she sought illicit drugs readily available in the Jail.  Ms. DeVargas injected these illicit drugs because Defendant County, as a matter of policy or custom, refused to treat her OUD with Suboxone or Methadone. FAC, ¶¶99, 112(a), 112(b). In addition, Defendants provide medical treatment to other detainees who have serious disabilities but discriminate against detainees with OUD.  To force her to inhale Narcan for which there was no legitimate medical justification, Defendants used excessive force causing Ms. DeVargas great physical and emotional pain.

Adding both insult and injury, in the complete absence of legitimate penological reasons, Defendants shackled Ms. DeVargas to her hospital bed the entire time she was on oxygen, intubated, on intravenous medication and unable to feel or use her limbs.  Not being a flight or safety risk, Ms. DeVargas should never have been shackled in the hospital.

Facts supporting all of Plaintiffs' federal and state law claims are properly alleged in the FAC.  Consequently, Defendants' Motion to Dismiss (Doc. 10) is not well taken and should be denied in its entirety.

## II.  Standard of Review for a Motion to Dismiss

The sufficiency of a complaint is a question of law. Granting a motion to dismiss is a harsh remedy which must be very carefully applied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.  Thus, the Court must accept as true all well-pleaded facts and must construe the facts and all inferences that may reasonably be drawn from them in the light most favorable to the plaintiff. *Dias v. City and County of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009).

A claim is plausible "if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia,* 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Iqbal v. Ashcroft,* 556 U.S. 662, 678 (2009)). The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly,* 550 U.S. at 556.

### III.  Plaintiff Alleges Plausible Deliberate Indifference Claims as to Inadequate Medical Care and Dangerous Conditions Under the Eighth and Fourteenth Amendments Against Defendants Olivares and Santa Fe County[1]

In their Motion Defendants improperly rely entirely on summary judgment case law.  In so doing, Defendants improperly argue the facts, draw negative inferences *against* Plaintiff, and thus effectively disregard the legal standard for motions to dismiss.

### A.    Plaintiff's Eighth and Fourteenth Amendment claims against Dr. Olivares.

Plaintiff alleges that Dr. Olivares violated Carmela DeVargas's Eighth and Fourteenth Amendment rights by being deliberately indifferent to her serious medical needs both in his role as medical provider for pretrial detainees at the Santa Fe County Detention Center and in his role as medical gatekeeper controlling access to specialized care including diagnostic testing. Plaintiff alleges that Defendant Olivares's conduct constituted two types of recognized medical provider deliberate indifference. "First, a medical professional may fail to treat a serious medical condition properly." *Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000). "The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* "[A] prison medical professional who serves solely as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if [he or she] delays or refuses to fulfill that gatekeeper role." *Id.; Layton v. Bd. of County Com'rs of Oklahoma County,* 512 Fed. Appx. 861, 869 (10th Cir. 2013) (internal quotation marks and ellipsis omitted).

In the instant case, Plaintiff alleges numerous facts that Defendant Olivares knew, or from which it can reasonably be inferred that he knew, and disregarded the risk of substantial harm to

---

[1]    Plaintiff's response regarding the claims of Defendants' unconstitutional administration of Narcan and failure to provide treatment for detainees with OUD are addressed separately in Sections VI(A-C) and VII(B) below.

Ms. DeVargas at the different times that he deliberately chose to not examine Ms. DeVargas or order timely diagnostic testing or timely transfer her to a hospital.  Defendant knew Ms. DeVargas was an IV drug user suffering from OUD; and that she was undergoing extreme accelerated withdrawal due to the improper administration of Narcan ordered by him.  Defendant knew she was suffering fever, abdominal and flank pain, had tested negative for a UTI on October 4, 2019; that as an IV drug user she was at an elevated risk for endocarditis and he knew that no diagnosis had been made as to the source of her infection.  FAC, ¶¶60-64.

Defendant Olivares knew that: the facility had a history of rampant uncontrolled MRSA infections; MRSA by its nature is dangerous and resistant to antibiotics; detainees had died in the facility from complications resulting from the failure to timely diagnose and treat infections and other emergent medical conditions; and that illicit drugs were readily available within the facility.  FAC, ¶¶24-25, 33, 40, 42, 100-112.

Defendant knew that Ms. DeVargas's fever and pain returned aggressively after abating for a brief time in response to a round of generic antibiotics and that Ms. DeVargas had used illicitly acquired Suboxone while in the facility. In the morning hours of October 18, the pain had reduced her to tears but she was not examined. Defendant Olivares had her returned to her cell on October 18, 2019 without making any diagnosis or ordering any treatment despite the fact that a Code Blue emergency had been called because of her deteriorating condition. He knew she was having extreme difficulty breathing, had extreme pain so severe that she could not stand, had used illicitly obtained Suboxone that morning, and as an opioid user was highly susceptible to very dangerous infection.  Defendant chose not to order any blood work or any testing to be done that day.  FAC, ¶¶67-76.

Later on October 18, Defendant Olivares finally ordered that an x-ray be performed off-site, on October 22, four days later.  In delaying the x-ray and any treatment he consciously dis-

regarded the obvious risk that she would continue to suffer considerable pain and deterioration of her condition; he also continued to choose not to conduct any diagnostic testing that might reveal infection or the source of her pain and breathing difficulty; he waited until her condition continued to worsen before finally ordering that she be taken to the hospital around 12:15am on October 20, 2019. Defendants further delayed Ms. DeVargas's access to emergency medical care by taking over an hour to take her to the hospital. FAC, ¶¶ 67-76. Plaintiff further alleges that Defendant Olivares's deliberate indifference to Ms. DeVargas's serious medical needs caused her to suffer several days of considerable pain and was a direct cause of her paralysis and death. FAC, ¶¶61, 68-72, 76-80, 112. [2]

To survive a motion to dismiss, "a pretrial detainee must show the defendants were deliberately indifferent to [the detainee's] serious medical needs, measured by an objective component—whether the 'harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment'—and a subjective component—'that the defendants knew [he or she] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'" *Moore v. Diggins,* 633 Fed.Appx. 672, 675 (10th Cir. 2015) (quoting *Martinez v. Beggs,* 563 F.3d 1082, 1088-89). "To satisfy the objective component, the alleged deprivation must be 'sufficiently serious;' that is, it must expose the inmate to a 'substantial risk of serious harm.'" *Kellum v. Mares*, 657 Fed.Appx. 763, 767 (10th Cir. 2016) citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1970). Even an allegation of several hours of untreated pain may constitute substantial harm. *Al-Turki v. Robinson,* 762 F.3d 1188, 1194 (10th Cir. 2014). The subjective prong is satisfied by facts alleging the defendant knew of a substantial risk to the plaintiff's health or safety and disregarded that risk. *Farmer v. Brennan,* 511 U.S. 825, 837

---

[2]   Plaintiff's allegations against Santa Fe County arising out of these facts are addressed in the next section.

(1970). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. An inmate does not need to prove the defendant had actual knowledge of the danger or actually intended that harm befall the inmate. See, *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005).[3]

Defendants do not appear to dispute that Plaintiff has alleged a sufficient harm (terrible pain, paralysis and death) to satisfy the objective component. Instead, Defendants argue that Plaintiff "cannot establish that Defendant Olivares knew of and disregarded an excessive risk to Ms. DeVargas' health and safety subjective component of this claim." Motion to Dismiss, 16. Defendants wrongly rely entirely on cases in which **summary judgment** was awarded to prison officials after the plaintiffs were unable to show that the **evidence** amounted to more than *mere* negligence or even *extraordinary* neglect. Motion to Dismiss, 16-17. When a plaintiff only alleges a medical provider failed to treat a serious condition properly, "the medical professional has available the **defense** that he was merely negligent in diagnosing or treating the condition, rather than deliberately indifferent." *Mata,* at 1211 (emphasis added).  However, Plaintiff does not allege that Defendant Olivares was "merely" or even extraordinarily negligent. Instead, Plaintiff alleges facts from which reasonable inferences can be made that Defendant Olivares consciously disregarded the risk of substantial harm to Ms. DeVargas by failing to diagnose and treat her; delaying her access to timely, appropriate diagnostic testing and treatment; and choosing not to conduct exams or diagnostic testing that would confirm her MRSA infection and dete-

---

[3]    Defendants wrongly contend that a claim is not stated against Defendant Olivares because there is no allegation that he had a culpable state of mind.  However, the requisite subjective element of a deliberate indifference claim is satisfied when facts are alleged that a defendant "knew of an excessive risk to the plaintiff's health or safety and disregarded that risk." *Farmer v Brennan,* 511 U.S at 834, 842.  That is, facts alleging the existence of an obvious risk to the health and safety of an inmate are sufficient to indicate awareness of the risk.  The FAC makes these allegations. FAC,44-¶¶53, 108. There is no requirement that the defendant intended the harm to occur.

riorating condition.

Plaintiff alleges Defendant acted in this manner despite knowing that Ms. DeVargas suffered from OUD, opioid withdrawal, illicit drug use, persistent and worsening fever, abdominal and flank pain, and despite also knowing that filthy conditions at the facility increased her risk to MRSA infections and complications thereof; that detainees at the facility, including Ms. DeVargas, had access to illegal drugs; that the facility had a high prevalence of MRSA infections; and that numerous detainees had died at the facility because they were not provided timely diagnosis and treatment. FAC, ¶¶24, 25, 33, 40, 42, 54, 57, 60-64, 67-76, 100-112.

These allegations in Plaintiff's FAC are clearly distinguishable from the cases relied on by Defendants in which plaintiffs were unable to defeat summary judgment **after** discovery. *Cf. Shannon v. Graves,* 257 F.3d 1164, 1168 (10th Cir. 2001) (facts regarding one incident in which prisoner was not given adequate protective gear when cleaning sewage "suggest negligence – not a wanton and obdurate disregard for inmate safety."); *Verdecia v. Adams,* 327 F.3d 1171 (Upholding summary judgment for jail officials when prisoner could not show that they knew that he was Cuban or had been housed in cell with dangerous gang members and previous altercation was found to not be gang-related); *Self v. Crum,* 439 F.3d 1227, 1234 (concluding that the **evidence** at most established that jail doctor, after extensive examination, observation and lab work, misdiagnosed the plaintiff's condition and such misdiagnosis did not establish a culpable state of mind); *Spencer v. Abbot,* 731 Fed.Appx. 731, 746 (10th Cir. 2017) (Finding that "where the medical professional provides a level of care *consistent* with the symptoms presented by the inmate, **absent evidence of *actual knowledge or recklessness***, the requisite state of mind cannot be met.") (Italics in original, bold added).

Defendants' improperly challenge the alleged facts at this pre-discovery stage and draw negative inferences against Plaintiff to argue that Plaintiff cannot **prove** Defendant Olivares had

a sufficiently culpable state of mind. This is not the test. Plaintiff's burden at this stage is to show that he **alleged** sufficient facts, which if true, would show Defendant consciously disregarded the risks of substantial harm to Ms. DeVargas. The FAC more than meets this threshold burden.

Contrary to Defendants' claims, Plaintiff does not allege "mere" negligence nor is Plaintiff required to **prove** the subjective component of Defendant Olivares' deliberate indifference at this time. "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. "[T]he relevant question is the ***risk*** of substantial harm, not whether the official knew of the specific medical condition causing the symptoms presented by the prisoner." *Kellum,* at 770 (Emphasis in original). In the FAC Plaintiff has repeatedly and in great detail alleged that Defendant Olivares had a sufficiently culpable state of mind in choosing not to examine, diagnose and treat Ms. DeVargas, delaying in her treatment, and failing in his gatekeeper function by not ordering timely diagnostic testing or Ms. DeVargas's early transfer to the hospital. Plaintiff further alleges that in so doing Dr. Olivares consciously disregarded obvious risks of substantial harm to Ms. DeVargas and caused her considerable, unnecessary pain and deterioration of her condition resulting in her paralysis and death.

The Court "must accept the allegations of the complaint as true and construe those allegations, any reasonable inferences that might be drawn from them, in the light most favorable to the plaintiff." *Moore,* 676 (reversing dismissal of claims against nurse and doctor at jail because the district court wrongly made inferences against the plaintiff). The allegations set forth in Plaintiff's FAC are analogous to the claims brought in Tenth Circuit cases in which dismissal was found not to be appropriate. For example, in *Moore,* the Court found that the pretrial detainee sufficiently alleged defendants knew of his pain, lack of stability and disability and did not make efforts to obtain a cane or walker before he fell and suffered additional pain and injury to

10

support his claim that the nurse and doctor "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id*.  In *Kellum,* the Tenth Circuit reversed both the district court's dismissal of the plaintiff's Eight Amendment claim against the detention center nurse and summary judgment for the corrections officer responsible for a five-hour delay in getting medical treatment for the detainee which caused her condition to get worse and substantial unnecessary pain and suffering. *Kellum,* 765. Notably, in *Kellum* the plaintiff's medical expert testified that "the staphylococcus aureus bacterium responsible for [the detainee's] heart infection doubles every twenty minutes, that the bacterium is very aggressive, and that a few days of delay could make a big difference in the patient's outcome." *Id.*, 766.

Moreover, Defendant Olivares cannot escape liability for his deliberate indifference to Ms. DeVargas's serious medical needs through his decision to remain deliberately ignorant of the cause of Ms. DeVargas's pain and infection -- by not examining her on October 4, 5 and 19 and by not conducting necessary, timely diagnostic testing -- or by his delayed decision to order her taken to the hospital only after she suffered intolerable pain and worsening illness for almost two weeks. "An official would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he suspected to exist." *Id.* at 752. See also, *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 419 n. 1 (1997) ("[D]eliberate ignorance and positive knowledge are equally culpable"). In addition, any subsequent medical care that is provided is not relevant to whether a specific medical provider "knew of and disregarded an excessive risk to [an inmate's] safety." *Mata v. Saiz, supra,* 427 F.3d at 756 (Reversing summary judgment for prison nurse when issue of material fact existed as to whether nurse's inaction in response to inmate's complaints of chest pain constituted deliberate indifference to the inmate's serious medical needs).

Despite Defendants' efforts to draw inferences **against** Plaintiff and to argue facts not in evidence, whether the evidence will ultimately **prove** Plaintiff's claims is simply not before the Court at this juncture and the summary judgment case law upon which Defendants rely does not assist the Court in determining whether Plaintiff's **allegations, including all reasonable inferences in his favor,** state a claim for relief. Indeed, it is clear that Plaintiff has alleged cognizable and plausible claims for relief, based on clearly established Tenth Circuit case law, as to Defendant Olivares's deliberate indifference in providing medical care to Ms. DeVargas. Plaintiff has set forth detailed allegations that Defendant Olivares consciously disregarded the risk of substantial harm to Carmela DeVargas by deliberately denying her critical medical care and diagnostic testing, delaying her access to medical care and testing, and failing in his role as gatekeeper by choosing not to order the testing and treatment she desperately needed. Plaintiff further alleges that Defendant Olivares consciously disregarded the risks to Carmela DeVargas when he decided not to order any testing that would reveal the type of infection she had and consciously remained deliberately ignorant of the cause of her symptoms while she continued to suffer pain and deteriorating health soon resulting in her becoming quadriplegic and dying.

**B.     Plaintiff's Eighth and Fourteenth Amendment claims against Defendant County.**

Plaintiff alleges that Defendant Santa Fe County violated Ms. DeVargas's Eighth and Fourteenth Amendment rights in at least two different ways. First, Defendant County was deliberately indifferent in failing to rectify dangerous conditions of which it was aware, specifically rampant MRSA and illegal drugs in the facility, staffing shortages, and untimely and woefully inadequate provision of medical care, resulting in detainees suffering unnecessary and avoidable pain, sickness and death. Second, Plaintiff alleges facts from which it can be inferred that Defendant County deliberately disregarded the serious medical needs of detainees, including Ms. DeVargas, as a result of its unconstitutional policies or customs.

To establish that Defendant County is liable for its deliberate indifference to Ms. DeVargas' serious medical needs, Plaintiff must allege and will have to prove that Ms. DeVargas's constitutional rights were violated and "that the county or its authorized decisionmaker intentionally deprived [her] of a federally protected right **through its unconstitutional policy.**" *Layton,* 870 (emph. added).  Defendant County "may be liable for an act performed pursuant to a 'custom' that has not been formally approved on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cty. Comm. v. Brown, supra,* 520 U.S. at 404-05.[4] Moreover, "[t]he failure to remedy ongoing constitutional violations may be evidence of deliberate indifference[.]" *Id.* at 407. In *Layton  v Bd. of Cty. Comm. of Okla. Cty,* 512 Fed. App'x  861 (2013) the Tenth Circuit reversed summary judgment for the county when it held that a reasonable jury could find that defendants "were on notice as to the problems with the jail's medical-care system, and that had they taken any number of possible remedial actions – many of which were explicitly identified by the DOJ and OSDH – [the plaintiff's] condition would not have deteriorated and his death could have been avoided by timely medical intervention." *Layton,* 872.

"The requisite intent is deliberate indifference to inmate health or safety." *Id.,* 871 "[T]he deliberate indifference standard may be satisfied when the County has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* In a recent decision, the Tenth Circuit reversed summary judgment for the defendant county on both the plaintiff's deliberate indifference claims that the county failed to train non-medical personnel on how to respond to medical emergencies and that the county had an unwritten policy or custom of releasing inmates rather than allowing inmates to transfer from one medical facility to another." *Lance v.*

---

[4]    The Supreme Court has long recognized this principle. *Adickes v S.H. Kress & Co.* 398 U.S. 144, 167-68 (1968).

*Morris,* 985 F.3d 787, 800-804 (10th Cir. 2021).  On summary judgment the Tenth Circuit held that the plaintiff had provided sufficient evidence that the alleged policy existed and a reasonable factfinder could find that the policy delayed needed specialized treatment and could infer "that delays in specialized care would inevitably result from the county's policy." *Id.,* at 804. "[A] municipality is deliberately indifferent when it obtains actual or constructive notice that an action is substantially certain to cause a constitutional violation and the municipality chooses to disregard this risk." *Id.* citing *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1318 (10th Cir. 2002). See also, *Ramos v. Lamm,* 639 F.2d 559, 574-578 (10th Cir. 1980) (Upholding finding of deliberate indifference against the State of Colorado based in part on insufficient onsite prison medical staffing and deficiencies in resources to transport prisoners to offsite medical facilities.).

In the instant case, the FAC alleges facts demonstrating that Defendant County had a long history of providing constitutionally inadequate medical care to inmates in the Santa Fe County Jail. These alleged facts include findings to this effect by the DOJ, a settlement agreement Defendant County entered into with the DOJ in 2008, and a history of deteriorating inmate medical care after the hiring of Defendant Sedillo for political reasons. FAC, ¶¶17-24, 100-105.  There have been at least seven inmate deaths during the 2012-19 time period, including deaths of inmates known to suffer from OUD and/or MRSA infections. FAC, ¶¶24, 103.

The FAC alleges facts which show or from which the fact finder can infer that Defendant County had a practice or custom of disregarding known risks of substantial harm to inmates, including Ms. DeVargas. FAC, ¶¶1-2. Plaintiff specifically alleges that Defendant County knew: 1) there was widespread and uncontrolled MRSA in the facility, 2) that MRSA is an aggressive, antibiotic resistant infection that requires timely diagnosis and treatment to limit its spread and prevent life threatening complications, 3) there was widespread opiate addiction within the Jail, 4) a high percentage of inmates suffered from OUD, 5) IV drug users are at high risk of both spread-

ing infections and suffering life threatening complications from MRSA and other infections, 6) a significant number of inmates had died or nearly died from untreated OUD and/or MRSA infections, and 7) the Jail had a long history of chronic problems regarding improper and inadequate medical care given to or withheld from detainees. FAC, ¶¶16-25, 33, 40, 73, 100-105.

Plaintiff further alleges facts from which it can be inferred that Defendant County deliberately disregarded the serious medical needs of detainees because of an unofficial policy or custom of one or more of the following; 1) not holding ill detainees in medical for observation, but sending them back to their cells leaving their access to medical care in the hands of understaffed, inadequately trained corrections officers (FAC, ¶¶60-61, 68-71, 74); 2) not conducting onsite diagnostic testing and unreasonably delaying necessary offsite diagnostic testing in which detainees whose conditions steadily deteriorate only received such testing if and when they are finally sent to hospital (FAC, ¶¶63, 69, 73, 75, 77-79); 3) not providing adequate physical exams due to inadequate onsite physician coverage resulting in inmates suffering unnecessary pain and worsening health (FAC, ¶¶63, 64, 67, 69, 75, 77-78); and 4) delaying access to emergency medical care due to staff shortages and due to inadequate procedures and training necessary to ensure that inmates receive timely emergency and specialized care, especially when transfer to the hospital or another specialist is necessary (FAC, ¶76). See also, FAC, ¶¶1-2. Moreover, Plaintiff alleges that Defendant Santa Fe County's unconstitutional, unofficial policies or customs caused withholding of and delayed diagnostic testing and medical care to Ms. DeVargas as set forth above. FAC, ¶112.[5]

---

[5]   If the Court finds that Plaintiff's policy and custom allegations require greater specificity, Plaintiff requests leave to amend to further allege that the deliberate indifference of Defendant Olivares in denying and delaying critical diagnostic testing and medical care was caused at least in part by Defendant County's unofficial policy and custom of denying access to such medical services due to staffing shortages and/or other "cost-saving" measures.

As this Court observed in *Russell v. Dominguez,* 2013 WL 12328846 *7: "Plaintiffs claim specific municipal policies violate federal law. The Supreme Court observed in *Bd. of Cty. Comm. v. Brown,* 520 U.S. 397, that when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the un- lawful policy puts an end to the question. *See Brown,* 520 U.S. at 403-44. Here, Plaintiffs argue their 14th Amendment rights were denied as a result of [Defendant's] policies. This is sufficient to survive a motion to dismiss."

**C.     Defendant Olivares Is Not Entitled to Qualified Immunity as to Plaintiff's Claims of Deliberately Indifferent Medical Care and the Filthy and Dangerous Conditions at the Jail.**

"It was clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when 'a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency … and the prison official, knowing that the medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell.'" *Kellum,* at 768 (quoting *Al-Turki v. Robinson,* 762 F.3d at 1194). *Al-Turki* established that a medical provider violates "clearly established law by choosing to ignore Plaintiff's repeated complaints of severe abdominal pain and requests for medical assistance, thus completely denying him any medical care 'although presented with recognizable symptoms which potentially create[d] a medical emergency'", even if it turns out to not be an actual emergency. *Alturki,* at 1195. In *Kellum,*, the court held that allegations of delay in treating and failure to conduct proper diagnostic tests on the plaintiff set forth a claim for deliberate indifference.  The Court noted evidence that patients with endocardits caused by sepsis are treated successfully with antibiotics when they receive timely emergency care at the first signs of sepsis. *Kellum,* 766. Ms. DeVargas was such a patient and Defendant's failure to conduct proper diagnostic tests in order to learn the source of and then treat her infection, and the delay in

referring her to the hospital led to her paralysis and death.

It is also clearly established that even a brief delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. *Mata,* 427 F.3d at 751; *Estate of Booker v Gomez,* 745 F.3d. 495, 432 (10th Cir. 2014). Consequently, Defendant Olivares is not entitled to qualified immunity on these claims.

### IV.  Plaintiff's FAC Properly States Claims for Relief Under the Tort Claims Act Against Defendant Santa Fe County.

Defendants misconstrue Plaintiff's Tort Claims Act claims against Defendant County by arguing that Plaintiff's claims under §41-4-6 are limited to a claim of negligent supervision. Motion to Dismiss, 28-29. Moreover, Defendants attempt to reduce Plaintiff's allegations regarding Defendants' willful and/or negligent acts and omissions as decisions that affected only Ms. DeVargas. *Id.*, 29-30. Notably, Defendants do not challenge the sufficiency of Plaintiff's allegations under the waiver of immunity under §§41-4-9 or 41-4-10.[6]

"Section 41-4-6 waives immunity for the operation or maintenance of a public building, which may include proof of negligent acts of employee supervision that is part of the operation of the building." *Upton v. Clovis Municipal School District,* 2006-NMSC-040, ¶16. The alleged negligence must create a condition that is dangerous "at least potentially, to the particular class of people that use the building or facility in question." *Id.,* ¶23. Defendants' reliance on case law concerning claims of a risk to a single individual is misplaced. Motion to Dismiss, 29-30. Plaintiff does not assert a claim solely for negligent supervision or that the County's acts and omissions created a condition at the Jail which was dangerous to Ms. DeVargas alone.  Instead, Plaintiff alleges that Defendant County negligently operated and maintained the Jail in such a manner that the premises were dangerous to a class of people that use the facility, which included

---

[6]  Defendants' arguments regarding Plaintiff's claims under §41-4-12 for batteries suffered by Ms. DeVargas are addressed in Section VI(D), below.

Ms. DeVargas, and that this caused her death.

"Section 41-4-6 contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government[.]" *Callaway v. N.M. Dep't of Corrections,* 1994-NMCA-049, ¶17 (Reversing dismissal of claims against the Department of Corrections for failing to remedy a known danger presented by violent inmates). In the instant case, Plaintiff's allegations are analogous to the waiver of immunity for premises liability in *Callaway* and *Upton.* In *Callaway,* the New Mexico Court of Appeals held that allegations that defendants knew of and failed to remedy danger to the general prison population created by roaming violent gang members, that negligent security practices "created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable" were sufficient to waive immunity under §41-4-6. *Id.,* ¶19. Similarly, in *Upton,* the New Mexico Supreme Court held that the "[f]ailure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs." *Id.,* ¶24 (Reversing dismissal of complaint alleging that student died from severe asthma attack after information regarding her condition was not relayed to substitute teacher, the teacher pushed the student to exercise beyond her abilities, and school personnel were negligent in responding to the emergency.). "[A] school simply cannot operate in a safe, reasonable, and prudent manner without affording at the very least, the health and safety services that students have been promised, and upon which parents have relied." *Id.,* ¶13.

In finding a waiver of immunity under §41-4-6, the *Upton* Court found that the alleged facts were more analogous to *Callaway* than to *Archibeque v. Moya,* 1993-NMSC-079, in which the administrative decision to release an inmate into the general population of prison where he was subsequently attacked by a known enemy created a risk solely for the individual inmate. *Id.,*

¶¶20-21 (comparing *Archibeque v. Moya, supra,* and *Callaway v. N.M. Dep't of Correcions, supra.*)  See also, *Kreutzer v. Aldo Leopold High School,* 2018-NMCA-005, ¶¶60-63 (No waiver of immunity under 41-4-6 where, after discovery, the plaintiff did not show that the defendant school knew or should have known of a dangerous condition that presented a risk to students.).

As set forth in the previous section, Plaintiff's FAC contains detailed allegations that Santa Fe County caused, knew of, and failed to rectify dangerous conditions at the Jail, which had harmed previous detainees, were likely to cause harm to other detainees, and did in fact harm Ms. DeVargas, causing her considerable pain, paralysis and, ultimately, her death. FAC, ¶¶1-2, 13-25, 33, 40, 100-107, 109-111, 124-128, 130-136, 142. The FAC alleges that Defendants' acts and omissions resulted from unofficial policies and customs of Defendant County. FAC, ¶¶1-2 60-64. 67-71, 73-79, 100, 102-107, 109-111. Plaintiff further alleges that Defendant Santa Fe County is liable under *respondeat superior* and vicarious liability for the negligent acts and omissions of its employees and agents. FAC, ¶¶5-9, 13-14, 106-107, 125. These alleged facts are sufficient to show that Defendant negligently maintained and operated the Jail and its medical facility. Immunity is waived under §41-4-6 because Defendant's negligence created an unsafe and dangerous condition which threatened a class of people who used the Jail and its medical facilities, *i.e.,* detainees suffering OUD and other emergency medical conditions such as infections and withdrawal. See also, *Rave v. Bd. Of Comm'rs for County of Bernalillo,* 55 NDLR P 166, 2017 WL 3600452 *10 (D.NM 2017) (allegations that "the County's employees ignored information he gave them about his medical conditions, and failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues" stated a claim under §41-4-6).

Lastly, Defendants' argument that Plaintiff cannot pursue his claims concerning the lack

of medical care and the filthy and dangerous conditions in the Jail under §41-4-12 for violations of the State Constitution is also without merit.  Motion to Dismiss, 29.  Section 41-4-12 expressly waives immunity when a law enforcement officer causes the deprivation of a right secured by the New Mexico Constitution. *California First Bank v State,* 1990-NMSC-106, ¶26.  "[I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law." *Weinstein v City of Santa Fe,* 1996-NMSC-021, ¶7.

Defendants Williams and Sedillo, respectively as the warden and director of the Jail, were law enforcement officers within the meaning of §41-4-12. *Abalos v. Bernalillo County District Attorney's Office*, 1987-NMCA-026, ¶29.  Plaintiff alleges that these Defendants' acts and omissions were willful and demonstrated conscious disregard for Ms. DeVargas's serious medical needs in violation of her state constitutional rights. FAC, ¶¶1-2, 13-25, 100, 102-111, 141. Defendant County is liable under *respondeat superior* and vicarious liability for violations of state constitutional rights caused by its employees acting in the scope of their duties and under the apparent authority of Santa Fe County. See, *Garcia v. Martinez,* 414 F. Supp.3d 1348, 1358-1359 (Finding that abuse of prisoner occurred in scope of duties under Tort Claims Act, but vicarious liability did not apply because the corrections officer in that instance was not a law enforcement officer under the Act because he worked in a prison housing convicted prisoners, not a jail housing pre-trial detainees).

**V.   Plaintiff Properly Alleges that Defendants County, Sedillo, Williams, Rios and Rojas Violated Ms. DeVargas's Federal Constitutional and State Law Rights When They Kept Her Shackled in Bed When They Knew She Was Intubated, Quadriplegic, Critically Ill and Dying, and Had Been Told by the Hospital Medical Director to Remove the Shackles Because They Posed a Substantial Risk to Ms. DeVargas's Health.**

**A.      Plaintiff States a Due Process Excessive Force Claim Under Section 1983.**

Because Ms. DeVargas was a pretrial detainee, Plaintiff's excessive force claim must allege facts from which a jury could reasonably infer the conduct of defendants was objectively unreasonable. There is no subjective intent element under this standard. *Kingsley v. Hendrickson,* 576 U.S. 389, 396-400 (2015).  In their Motion Defendants fail to address the unreasonable force claim brought under *Kingsley* and their motion to dismiss this claim should be denied for this reason alone.

Further, Defendants' Motion omits numerous material facts alleged in the FAC including that: 1) the person who said to remove the shackles was the Medical Director of the hospital; 2) Defendants were told the reasons for doing so: Ms. DeVargas was intubated, she could not move and the mechanical restraints posed a risk to her health due to skin infections; 3) there was no legitimate law enforcement need to place the mechanical restraints on her because, *inter alia*, Defendants knew she could not walk since she was on a ventilator and was quadriplegic; and 4) she was fully conscious of her situation and suffered substantial emotional harm from being kept shackled while on life support, quadriplegic and dying. FAC, ¶¶82, 85, 87, 119, 120. Consequently, Defendants' Motion is not well taken and should be denied.

Specifically, the FAC alleges that on October 21, 2019, Ms. DeVargas was intubated and in a sedated coma. Defendant's jail guards, acting pursuant to the direction of Defendants Rios and Rojas, placed mechanical restraints on her body.  Due to her medical condition these restraints presented a substantial risk for causing a skin infection or otherwise worsen her condition. The Hospital Medical Director contacted Defendant Rios and told her the mechanical restraints should be removed because of the risk to Ms. DeVargas's health. By October 24, 2019, she had become quadriplegic due to her deteriorating medical condition. Defendant Rios refused to have the restraints removed.  She said that Defendant County would agree only to remove the

21

restraints every two hours and adjust them in a different position regardless of Ms. DeVargas's medical condition. FAC, ¶¶82, 84.

Defendants Williams, Rios and Rojas knew that Ms. DeVargas could not walk because she was intubated and quadriplegic. They knew she was fully aware of her surroundings. Despite the absence of any legitimate law enforcement purpose, the guards, acting pursuant to the orders of Defendants Rios and Rojas and pursuant to Defendant County's policies and procedures, cruelly, inhumanely and sadistically kept Ms. DeVargas shackled by her legs and/or arms. Guard notes state this was done "in case she decides to run."  Defendants' conduct was an outrageous affront to Ms. DeVargas's personal dignity and demonstrated a deliberate indifference to her mental, physical and emotional health.  FAC, ¶¶85, 87.

On October 26, 2019, Dr. Accarino informed Ms. DeVargas of her prognosis. Among other things, he asked her if she wanted to donate her organs and told her she would have to decide soon. Ms. DeVargas had to decide whether to end her own life or try to live for what would be a brief period of time intubated, in a quadriplegic state, in a facility located out of state and in shackles. On October 27, 2019, Ms. DeVargas, communicating through her eye movements, informed Dr. Accarino she decided she would rather end her life.  FAC, ¶¶94, 95. On October 27, 2019 the misdemeanor charges were dismissed against Ms. DeVargas and Santa Fe County relinquished custody and control of her.  FAC, ¶98.  After a week of being shackled, at 6:53 p.m., the shackles were removed. FAC, ¶97.

Defendants Rios, Rojas, and Williams had their subordinate employees keep Ms. DeVargas shackled knowing: 1) she was intubated and could not live without being attached to the ventilator; 2) she was critically ill, 3) she was in a state of quadriplegia as of the early morning of October 24, 2019; 4) she could not possibly walk; 5) she was dying; 6) she was fully aware of the fact that she was shackled, and 7) as early as October 21, 2019, the hospital medical staff had

asked Defendants to remove the restraints because they could cause injury to her. Defendants knew she posed no threat to their safety or to the safety of others, was a non-violent offender awaiting a probation violation hearing who could not escape from the hospital room, and was guarded around the clock by their correctional officers. FAC, ¶¶85,87, 119.

Despite the absence of any legitimate law enforcement purpose, the guards, acting pursuant to the orders of Defendants Rios and Rojas and pursuant to Defendant County's policies and procedures, cruelly, inhumanely and sadistically kept Ms. DeVargas shackled by her legs and/or arms. According to Defendants, this was done "in case she decides to run." Defendants' conduct was an outrageous affront to Ms. DeVargas's personal dignity and demonstrated a deliberate indifference to her mental, physical, and emotional health. FAC, ¶¶85,87, 119.

Ms. DeVargas was kept in shackles from October 21-October 27, 2019, including while her 7-year-old son and father were present, a fact about which she was fully aware. FAC, ¶92.[7] The shackling of Ms. DeVargas was done in the absence of any legitimate law enforcement need, under circumstances where she had to and did submit to the authority of the officers. The circumstances of the shackling were outrageous and offended contemporary concepts of decency and human dignity and caused her to suffer substantial emotional distress. FAC, ¶120.

Plaintiffs allege that: 1) under the totality of the circumstances the shackling of Ms. De-Vargas was objectively unreasonable and constituted an unreasonable use of force; 2) Defen-

---

[7]  Making the situation even worse by causing Ms. DeVargas to lie in the hospital dying and alone, even though Defendants knew that Ms. DeVargas was critically ill, they refused to contact Ms. DeVargas's father, who was listed as her emergency contact, in violation of Defendant County's written policy requiring the next of kin of an inmate be contacted if an inmate was critically ill. Defendants' conduct kept Ms. DeVargas isolated as she was dying. Defendants deprived Ms. DeVargas of the comfort of her father, her son and siblings at a time when she, and Defendants, knew she was dying. Not until the hospital staff learned that Ms. DeVargas's family had not been contacted and demanded this be done because she was dying did Defendants contact Mr. DeVargas. This conduct by Defendants further evidenced a deliberate indifference to her emotional and mental health.  FAC, ¶¶88, 89.

dants' conduct was deliberately indifferent and inflicted substantial emotional pain on Ms. De-Vargas, in violation of the Fourteenth Amendment to the United States Constitution; 3) no reasonable officer would have thought this conduct was lawful, **and 4)** the conduct described in paragraphs 119-121 was done pursuant to the policy and/or custom of Defendant County and approved by Defendants Sedillo and Williams, who had personal knowledge of the facts alleged about Ms. DeVargas's condition and shackling. FAC, ¶¶121, 122.

As set forth above, the FAC alleges that Defendants subjected Ms. DeVargas to unnecessary and unreasonable force for a week by keeping her in shackles knowing there was no legitimate penological reason for doing and after being told by the Hospital Medical Director that keeping her shackled posed a substantial risk to her health and to remove them for that reason. Plaintiffs further allege Defendants' conduct caused Ms. DeVargas to suffer substantial emotional distress from the force applied and deprived her of her sense of personal dignity. Under 42 U.S.C. §1983, a physical injury is not required to set forth a claim. The allegations of injury in the FAC are sufficient to make out an excess force claim for the violation of her right to due process. *Kingsley, supra; Cortez v. McCauley,* 478 F.3d 1108, 1131 and n.25 (10th Cir. 2007) (*en banc*); *Holland Ex. Rel. Overdoff v. Harrington,* 268 F.3d 1169, 1191 (10th Cir. 2001).

Defendants contend they had a legitimate penological interest to keep Ms. DeVargas shackled "to insure the safety of others at the hospital and to prevent flight." Motion to Dismiss, 18. Guard notes state she was shackled "in case she decides to run." There are no facts in the FAC that even suggest that Ms. DeVargas, intubated and quadriplegic, could possibly have threatened the safety of persons at the hospital or could have run or fled.  It defies rational thought to even imagine how this could be so. Under the circumstances known to Defendants and their guards at the hospital, Defendants' asserted "legitimate" law enforcement concerns are, to say the least, frivolous.  Most importantly here, they are unconstitutional. *Blackmon v. Sutton,*

734 F.3d 1237, 1242 (10th Cir. 2013). Viewed in the light most favorable to Plaintiffs, the force allegedly used on Ms. DeVargas far exceeded what was necessary to accomplish any legitimate penological concerns. A jury could reasonably conclude that the force she was subjected to was "excessive in relation to th[e] purpose" for which it was purportedly employed. *Kingsley, supra.* Consequently, Defendants' Motion to dismiss these claims has no merit and should be denied.

**B.      The Shackling of Ms. DeVargas Also Violated Her Constitutional Rights Under the Standards Set Forth in *Bell v. Wolfish.***

Although Ms. DeVargas was a pretrial detainee, Defendants ignore *Kingsley* and attempt to characterize the claim as one for "conditions of confinement" under *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979).  Unlike an excess force case, a plaintiff in a "conditions of confinement case" must allege facts from which a jury could conclude a defendant acted not merely unreasonably, but with deliberate indifference. *Wilson v. Selter,* 501 U.S. 294, 303 (1991). Yet, even under this standard the outcome here is the same. Plaintiff's allegations that Defendants kept Ms. De-Vargas in mechanical restraints knowing she could not get out of bed, no less walk, due to her dire physical condition, knew the presence of the shackles posed a substantial risk to her health but disregarded the Medical Director's instruction to remove them, continued to "cruelly, inhu-manely and sadistically" keep Ms. DeVargas shackled by her legs and/or arms when there was no legitimate law enforcement purpose to do so, and caused Ms. DeVargas to suffer substantial emotional damage constitute facts from which the trier of fact could reasonably conclude Defen-dants acted with deliberate indifference.  Indeed, the trier of fact may reasonably conclude De-fendants' conduct was completely unnecessary to prevent Ms. DeVargas from fleeing, excessive in relation to any legitimate purpose, and inflicted punishment on Ms. DeVargas.  *Bell, supra,* 441 U.S. at 538.

Secondly, under *Bell* in the absence of a showing of express intent to punish, a plaintiff

may prevail where the defendant's conduct "appears excessive" in relation to the purposes as-signed to it.  "If a restriction or condition is not reaso

nably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitution-ally be inflicted upon detainees *qua* detainees." *Id.* at 539. As explained above, Plaintiff clearly alleges conduct that under the totality of the circumstances had no legitimate penological pur-pose and caused Ms. DeVargas to suffer "substantial emotional pain" and loss of her personal dignity.[8]  The use of restraints in the absence of penological/law enforcement reasons that were legitimate *under the circumstances* was unconstitutional.  *Blackmon v. Sutton,* 734 F.3d 1237, 1242 (10th Cir. 2013).

*Blackmon, a* pre-*Kingsley case,* was analyzed under the more rigorous deliberate indiffer-ence standard.  A young inmate who suffered from severe mental health problems was shackled to a restraint chair for hours. The plaintiff contended there were times he was shackled when there was no evidence that he posed a threat to harm himself or anyone else. Other times he was shackled because of a legitimate threat of self-harm but then was kept there for extensive periods after any threat of self-harm had dissipated. The court noted that in those instances where there was no risk of self-harm or harm to others, there was not a legitimate penological reason for the shackling.  The Court denied **summary judgment**, holding that by 1997, the defendants were on

---

[8]   Defendants' contention that Ms. DeVargas felt no physical pain from the shackles is immaterial. An allegation of psychological injury is sufficient to state a claim. *Northington v. Jackson,* 973 F.2d. 1518, 1523 (1992). It is alleged she was fully aware of the shackles and suffered substantial emotional pain.  Defendants may not defeat Ms. DeVargas's claim because the inadequate medical treatment they provided caused her to end up intubated where she could not talk and quadriplegic with no feeling in her arms and legs.  Moreover, an Eighth Amendment claim is responsive to "contemporary standards of decency." *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop v. Dulles,* 356 U.S. 86, 100 (1958).

26

notice that they could not use restraints with the express purpose of punishing **or without some legitimate penological purpose in mind.** *"*Yet, the record here suggests they may have used restraints in both forbidden ways at least some of the time." *Id*.  See also, *Stuart v. Jackson,* 24 Fed. Appx. 943, 950 (10th Cir. 2001) (holding outside a jail setting that the use of restraints on a citizen who posed no threat and under circumstances where it was not objectively reasonable to do so violated the Constitution).

Under the facts alleged in the FAC the trier of fact could reasonably conclude that there was no penological reason for shackling Ms. DeVargas. Defendants' absurd claim that they feared she might harm someone at the hospital or flee is not based on facts alleged in the FAC and cannot be accepted as true on a motion to dismiss. Viewed in the light most favorable to Plaintiff, the facts alleged in the FAC state a claim that Defendants violated Ms. DeVargas' Fourteenth Amendment rights under *Bell v. Wolfish.*

Finally, Plaintiff properly alleged *Monell* and supervisory claims against Defendant County, Williams and Sedillo for violation of her due process rights.[9] The FAC alleges the injuries to Ms. DeVargas were a direct result of a policy and/or custom of Defendant County, approved by Defendants Sedillo and Williams.  FAC, ¶¶119-121.  In fact, Defendants admit they "were simply following their security policy" in shackling Ms. DeVargas.  Motion to Dismiss, 18.  Defendants may not escape liability on a motion to dismiss by relying on a policy that they admit authorized the use of force on Ms. DeVargas when under the totality of the circumstances the use of the above-described force caused by that policy was "excessive in relation to th[e] purpose" for which it was purportedly employed. *Kingsley, supra; Blackmon, supra.*

As noted above this Court observed in *Russell v. Dominguez, supra *7*, where a plaintiff

---

[9]   Plaintiffs also allege that Defendant Williams was personally involved with the actions at issue. FAC, ¶122.

alleges specific municipal policies violate federal law, such allegations are sufficient to defeat a motion to dismiss. As in *Russell*, the Plaintiff here argues her "14th Amendment rights were denied as a result of [Defendant's] policies. This is sufficient to survive a motion to dismiss."

## C.   Defendants Are Not Entitled to Qualified Immunity.

*K.H. Through Murphy v. Morgan*, 914 F.2d. 846, 851 (7th Cir. 1990) (J. Posner), held that there are circumstances where a plaintiff need not point to prior similar cases to defeat a qualified immunity defense raised in a motion to dismiss:

> It begins to seem as if to survive a motion to dismiss on grounds of qualified immunity the plaintiff must be able to point to a previous case that differs only trivially from his case.  But this cannot be right.  The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.[10]

In *Hope v. Pelzer,* 536 U.S. 730, 741 (2002), the Court made clear that:

> [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *United States v. Lanier*, 520 U.S. 259 (1997), we expressly rejected a requirement that previous cases be 'fundamentally similar.' Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, … the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional."

The Court held that even though there were no cases with similar facts, prior cases provided sufficient notice that the "obvious cruelty" in the conduct at issue "should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection

---

[10] This holding has been cited favorably by the Supreme Court in *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 377 (2009), and adopted in numerous circuit opinions.  *See, e.g.*, *Simon v. City of New York*, 893 F.3d 83, 97 (2nd Cir. 2018) ("This is one of the uncommon 'obvious case[s]' in which 'the unlawfulness of the [defendants'] conduct is sufficiently clear even though existing precedent does not address similar circumstances'"); *Miller v. Kennebec County,* 219 F.3d 8, 11("While there is no case law directly relating to arrest warrants, it is self-evident that a seizure conducted pursuant to an arrest warrant must conform to the terms of that warrant.").

against cruel and unusual punishment." *Id.* at 745.[11]

Just as there were no cases holding that an inmate could not be shackled to a post (the facts in *Hope*), Counsel here could not find any case where a person was shackled while on life support and quadriplegic. Under the totality of the circumstances alleged here, however, that Defendants knew Ms. DeVargas was on life support, was quadriplegic and could not possibly move from her bed and **that the Hospital Medical Director told the guards to remove the shackles because they posed a danger to Ms. DeVargas's health**, no reasonable official would have believed that shackling Ms. DeVargas for a week served a legitimate penological purpose. *Kinglsey* provided notice to the indivdual Defendants that they could not use force on a pretrial detainee such as Ms. DeVargas that was objectively unreasonable under the circumstances.  Additionally, the holding in *Blackmon, supra,* 734 F.3d at 1242, provided sufficient notice to Defendants that it was unconstitutional to keep an inmate in restraints when there was no legitimate penological purpose served by doing so. Given the allegations contained in the FAC and in view of *Hope, Kingsley* and *Blackmon*, Defendants are not entitled to qualified immunity as to this claim.

**D.     Plaintiffs Have Also Stated A Claim for the Violation of the New Mexico Tort Claims Act, NMSA 1978, §41-4-12.**

First, Defendants have not moved to dismiss the state law battery claim against Defendant County arising out of the conduct of Defendants Rios, Rojas, Williams and the guards, all of whom were law enforcement officers within the meaning of Section 41-4-12.[12]  Second, Defen-

---

[11]   Recently in *Taylor v. Riojas,* 141 S.Ct. 52, 54 (2020) the Court ruled that no reasonable correctional officer could have concluded under the circumstances of that case to house inmates in such deplorably unsanitary conditions for such an extended period of time and "the obvious cruelty inherent" in the conduct provided officers with notice that their conduct was unlawful.

[12]   *Methola v. Eddy County,*1980-NMSC-145 (jail guards are law enforcement officers within the meaning of §41-4-12); *Abalos v. Bernalillo County District Attorney's Office*, 1987-NMCA-026, ¶29 (the director of a jail is a law enforcement officer within the meaning of that section).

dants' assertion that Plaintiff fails to state a claim for the violation of the New Mexico Constitu-

tion as to these other Defendants is without merit.   Plaintiff alleges that Defendant County's law

enforcement officers acting in the scope of their employment violated her state constitutional

rights. FAC, ¶¶8-10. Section 41-4-12 expressly waives immunity when a law enforcement officer

has caused the deprivation of any right secured by the Constitution and laws of New Mexico.

*California First Bank v. State,* 1990-NMSC-106, ¶26.  Defendants' Motion to Dismiss this claim

is not well taken and should be denied.

**VI.  Plaintiff Properly Alleges that Ms. DeVargas's Federal Constitutional and State Law Rights Were Violated by Defendants County, Olivares, Williams and Sedillo When Narcan was Involuntarily Administered on September 19, 2019.**

Plaintiffs allege that the grossly improper medical treatment and physical abuse of Ms.

DeVargas actually began on the day she was booked at the Jail when unreasonable force was

used to make her inhale Narcan and that this treatment was part of Defendants' unlawful custom

and practice. Defendants fail to view the facts alleged regarding the September 19, 2019 abuse of

Ms. DeVargas in the light most favorable to the Plaintiffs and then fail to apply the applicable

law.  Defendants' Motion as to this claim is without merit and should be denied.

Narcan is a drug used to prevent the death of someone who is unconscious and dying of a

drug overdose.  It has many dangerous potential side effects. In people with opiates in their sys-

tem, it will often cause increased sweating, nausea, trembling, vomiting, and headache. It may

cause numerous other adverse events. FAC**,** ¶49. Forcing Narcan on someone who appears

"stoned," sedated and under the influence is not appropriate because it will often put people with

opiates in their system into immediate dangerous withdrawal. FAC, ¶50.

Narcan should be administered only if a person is unconscious, cannot be awakened, and

is not breathing or their breathing is very slow and shallow.  It is intended only for someone al-

ready in or very close to respiratory arrest who is unresponsive when shaken or stimulated with a

sternal rub. FAC, ¶48.  In a medical setting, if someone appears to be breathing very slowly and possibly overdosing due to opiates, she should be given oxygen, observed, and her oxygen measured with an oximeter to see if Narcan is necessary (a simple and quick procedure done by putting a monitor on the person's finger for a few seconds).  FAC, ¶51.  Narcan is not to be used without also obtaining emergency medical care. When Narcan is properly administered, 911 must also be called, whether or not the person regains consciousness, and the person must immediately be taken to a hospital emergency room for evaluation and observation.  FAC, ¶¶52-53.

The FAC alleges that on September 19, 2019, Carmela DeVargas was booked at the Santa Fe County Jail around 7:00pm on a warrant for an alleged probation violation.  She was a pretrial detainee waiting for a hearing on the charge.  During the booking Defendant County's Jail staff, including Medical Director Defendant Olivares, learned that Ms. DeVargas was an IV drug user suffering from OUD. FAC, ¶¶9, 42.  She was placed in the Medical Unit, allegedly for refusing to cooperate with a strip search and for having "an abnormal scan."  Around 8:30 pm, a guard claimed he saw her "straddling the toilet with her head directly over the sink."   Nurse Mares and three correctional officers arrived shortly thereafter.  FAC, ¶43.

Ms. DeVargas spoke with the nurse and told her she did not feel well, she had stomach pain, and had done "a bad batch of drugs" before coming to the Jail.  She was not unconscious or unresponsive. There are no allegations that her skin was discolored, clammy or cold.  She was breathing, talking and was not in respiratory arrest. She was not given oxygen and her oxygen was not measured to see if Narcan was necessary. Nonetheless, upon being contacted by Nurse Mares, Defendant Olivares ordered or concurred that Narcan be administered to Ms. DeVargas. FAC, ¶44.

Ms. DeVargas repeatedly told Nurse Mares and the guards she did not want Narcan. FAC, ¶50.  She covered her face with her hands. She stated she would sue them for forcing it on her.

Ms. DeVargas "placed her hands over her nose," moved her body around, and kicked her feet in an effort to avoid having Narcan forced on her. FAC, ¶45. Four correctional officers then physically forced her to inhale it.  One officer forcibly grabbed Ms. DeVargas by the hair to keep her from moving her head. A second officer grabbed Ms. DeVargas by her wrist and applied a very painful compliance technique called a joint wristlock.  A third officer grabbed her legs and held them close to his body to prevent her from moving them. The fourth officer and a second nurse grabbed her arms and held them down. The force used on Ms. DeVargas, particularly the application of the joint wristlock and the pulling and holding her down by her hair, caused significant physical pain and emotional distress. FAC, ¶¶46, 123, 149(a).[13]

While Ms. DeVargas was being subjected to this force, Nurse Mares, acting on the instructions of Defendant Olivares, sprayed a dose of Narcan up Ms. DeVargas's nose.  At that time Ms. DeVargas was not in a state of respiratory arrest, was fully conscious and physically active. No reasonable person would have thought otherwise.  FAC, ¶¶46-47.  The failure to call 911 in this case indicates that Defendant Olivares and Nurse Mares did not follow proper medical procedures, that they knew Ms. DeVargas was not suffering from an overdose requiring emergency treatment, and that Narcan should not have been administered to her at all. FAC, ¶¶52-53.

The forced application of Narcan on Ms. DeVargas under the circumstances alleged was a shocking deviation from standard, accepted medical practice. Any person trained in the use of Narcan would have known she did not need and should not be given the drug. Defendants' conduct resulted in Ms. DeVargas's suffering opiate withdrawal, a severe, painful and dangerous condition for which she was then not properly treated. FAC, ¶¶48, 54. The infliction of substantial physical pain on Ms. DeVargas by the force described above and the improper use of Narcan when she was obviously not in a state of respiratory arrest and was objecting constituted an in-

---

[13]    These highly material factual allegations are all omitted from Defendants' Motion.

fliction of punishment. FAC, ¶¶ 46, 55, 56, 123.

Ms. DeVargas' injuries were caused by a policy and/or custom of Defendant County that was approved by Defendants Sedillo, Williams and/or Olivares. FAC, ¶123.

**A.     Plaintiff Has Stated a Claim of Excessive Force Under 42 U.S.C. Section 1983 Concerning the Administration of Narcan on September 19, 2019.**

Ms. DeVargas was a pre-trial detainee. The standard governing a pretrial detainee's claim alleging unreasonable, excessive force was established in *Kingsley v. Hendrickson, supra,* and the factors bearing on that inquiry are set forth at pages 21-22 above. In addition to alleging sufficient facts to establish excessive force, Plaintiff alleges Ms. DeVargas suffered substantial physical pain and emotional distress from the force applied. These allegations of injury are sufficient to make out an excess force claim for the violation of her right to due process. 42 U.S.C. §1983. *Kingsley, supra; Cortez v. McCauley,* 478 F.3d 1108, 1131 and n.25 (10th Cir. 2007) *(en banc)*.

Defendants do not assert the FAC fails to set forth a due process claim for excessive force. Rather, Defendant Olivares contends the allegation that he **ordered** the Narcan be administered is insufficient because it is not alleged that he **directed** the specific actions of the guards or the nurse in the manner in which the Narcan was administered. Motion to Dismiss, 19-21.

Plaintiff is not required to allege that Defendant Olivares **directed** the specific actions that violated Ms. DeVargas's due process rights for him to be liable. Under §1983, "Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The causal connection is satisfied if the defendant(s) set in motion a series of events that the defendant(s) knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." *Trask v. Franco,* 446 F.3d 1036, 1046 (10th Cir. 2006) (citations and quotation marks omitted).

The FAC alleges Defendant Olivares spoke with Nurse Mares after she had spoken with Ms. DeVargas.  Ms. DeVargas objected to having to take Narcan. Her oxygen level was not measured. Nurse Mares had four guards with her at the time she spoke with Defendant Olivares. Shortly after that call Ms. DeVargas was subjected to the force complained of. Critically, because Ms. DeVargas is deceased due to the subsequent alleged misconduct of Defendant Olivares there are no witnesses to this conversation other than Defendant Olivares, Nurse Mares and the guards. A court must be particularly cautious in dismissing an excess force claim when the victim is deceased. A court "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020) (citations omitted). Viewed in the light most favorable to Plaintiff, the facts alleged in the FAC are sufficient to allow a jury to reasonably infer that Defendant Olivares knew or should have known his conduct could cause the use of force to overcome Ms. DeVargas's objection to Narcan and that his order was a cause of the constitutional deprivation. A factual record must be created to determine the exact information conveyed to Defendant Olivares when he spoke with the nurse.[14]  Defendants' Motion to Dismiss as to this claim should be denied.

**B.    Plaintiff Has Stated A Claim for Deliberately Indifferent Medical Care Under Section 1983 Concerning the Administration of Narcan.**

A claim alleging deliberate indifference must allege facts showing both an objective and a subjective component. The objective component requires allegations of facts showing a defendant's conduct was "sufficiently serious." *Farmer v. Brennan,* 511 U.S. at 834.  This component

---

[14]  Depending on what the discovery reveals about the conversation and the role played by each employee, Plaintiff may seek leave to join Mares and the guards as defendants in this federal claim.

is satisfied if the conduct resulted in "substantial harm." *Oxendine v. Kaplan,* 241 F.3d 1276 (10th Cir. 2001).   Even an allegation of several hours of untreated pain may constitute substantial harm.  *Al-Turki v. Robinson,* 762 F.3d at 1194.

The subjective prong is satisfied by facts alleging the defendant knew of a substantial risk to the plaintiff's health or safety and disregarded that risk. *Farmer,* at 837. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842; *Rife v. Oklahoma Dept. of Public Safety*, 854 F.3d 637 (10th Cir.2017). An inmate does not need to prove the defendant had actual knowledge of the danger or actually intended that harm befall the inmate. See, *Mata v. Saiz,* 427 F.3d at 752.[15]

The use of Narcan is common.  It is used by many laypersons including caregivers, police officers, and family members of persons with OUD. *Adapt Pharma Operations v. Teva Pharmaceuticals, USA,* 2020 WL 342807, *2 (D. N.J.)  As per Fed. Rule Evid. 201(b)(2), the court may take judicial notice of the instructional video on its use put out by the maker of Narcan (nalexone) Nasal Spray 4m for lay persons, at "https://youtube.com Administering Naloxone" at 3:45-4:30.[16]  It was obvious that Narcan should not have been used on Ms. DeVargas as she was breathing without difficulty, she was responsive, her skin was not discolored, and she was actively engaging the nurse in conversation.

---

[15]   Defendants wrongly contend that a claim is not stated against Defendant Olivares because there is no allegation that he had a culpable state of mind.  However, the requisite subjective element of a deliberate indifference claim is satisfied when facts are alleged that a defendant knew of an excessive risk to the plaintiff's health or safety and disregarded that risk. *Farmer, supra,* at 837. That is, facts alleging the existence of an obvious risk to the health and safety of an inmate are sufficient to indicate awareness of the risk. Id. at 842. The FAC makes these allegations. FAC, ¶¶44-53,108. There is no requirement that the defendant intended the harm to occur.

[16]   The Court may also take judicial notice of the New Mexico Human Services Department instructions for patients and family members (p. 5), regarding when and how Narcan should administered. https://newmexico.networkofcare.org

The use of Narcan is mentioned in many cases.  In all of them the person given Narcan was unconscious, unable to respond to questions, or in respiratory arrest.  See, *e.g.*, *United States v. Seals,* 915 F.3d 1203, 1205 (8th Cir. 2019) (Narcan administered to man when paramedics and police found him in a comatose state); *United States v. Anderson,* 988 F.3d 420 (7th Cir. 2021) (Paramedics administered Narcan to man who locked himself in a bathroom and had stopped breathing due to an overdose); *United States v. Cockrell,* 769 Fed.Appx. 116, 118 (5th Cir. 2016) (Narcan administered after two victims of heroin overdose found unconscious).[17]

Plaintiff alleges Defendant Olivares's decision caused Narcan to be forced on Ms. DeVargas when there was no medical basis for use of the drug and caused her to suffer substantial physical pain and emotional distress and to go into opiate withdrawal, an exceedingly painful and life-threatening process.[18] These injuries constitute "substantial harm" and satisfy the objective component. *Al-Turki v Robinson,* 762 F.3d. at 1194. This was not a mere misdiagnosis but "a shocking deviation from accepted medical standards" and even a layperson with any training in the use of Narcan would know that its use on a person who was responsive and verbally and physical active was improper and dangerous.

Plaintiff has alleged facts that support the conclusion that Defendant Olivares's conduct constituted "an obvious risk" to Ms. DeVargas's health and safety.  He knew she was an opiate user. He knew Ms. DeVargas was not unconscious and not in or near respiratory arrest, but was conversing with the nurse. As a doctor, Defendant had to know that the use of Narcan under

---

[17]   See also, *Starkweather v. Archuleta,* 2008 WL 2323878 (D.Col.) (Inmate given Narcan who was found unconscious); *Green v. Slaughter,* 2019 WL 4072978 *2 (D. N.J.) (Narcon properly administered after inmate was found unconscious on bathroom floor, was taken to the medical unit where his vital signs were taken, he was provided with oxygen, and medical personnel called 911).

[18]   Opiate withdrawal is a serious medical condition for Eighth Amendment purposes. *Stojcevski v. Macomb Cty., Michigan,* 827 Fed. Appx. 515, 521 (6th Cir. 2020).

those circumstances was likely to put her into withdrawal. That the risk was obvious is sufficient to allow the jury to infer Defendant Olivares was aware of it. The subjective prong is properly alleged. Defendant Olivares's decision to order and/or approve the use of Narcan under the circumstances alleged constitutes a claim for deliberate indifference under the Due Process clause. Consequently, Defendants' argument that Plaintiff failed to allege that Defendant Olivares had a culpable state of mind is without merit.

Defendants' reliance on *Neisser v. Wexford Health Sources, Inc.* 2019 WL 6729409 *10,11) (D. Maryland) is misplaced. Significantly, the *Neisser* court's holding was **based on the sworn testimony** of a physician. Unlike Ms. DeVargas, Neisser was non-responsive and sweating profusely when found in his cell and was given Narcan to revive him. The doctor explained that the standard of care **for a non-responsive** patient to is to administer Narcan. Based on the testimony, the *Neisser* court concluded there were no exceptional circumstances that would provide a basis to find deliberate indifference. Here, the FAC specifically alleges that Ms. DeVargas was **not** unresponsive but was actively conversing with the nurse, did not want Narcan, and that Defendant Olivares knew this. Unlike in *Neisser,* Plaintiff is not yet able to present evidence from his expert medical witnesses who will testify that Narcan is not the standard of care when a patient is responsive and that it is reckless and dangerous to do so because of the likelihood that it will cause such a person to go into withdrawal.

Finally, Plaintiff properly alleges that the injuries suffered by Ms. DeVargas on September 19, 2019, were directly caused by a custom, practice or policy approved, acquiesced in or condoned by Defendant County and its policymakers Defendants Sedillo, Williams and Olivares who acted with deliberate indifference. FAC, ¶¶6, 7, 101, 108, 123. When an injury is alleged to have occurred due to the failure to properly train employees in an area where they are often required to act and where the inadequacy is likely to result in violation of constitutional rights, pol-

icymakers may be liable. *City of Canton v. Harris,* 489 U.S. 378, 390 (1989). The failure to adequately train jail personnel in the proper use of Narcan has been recognized as a basis for §1983 liability against a municipality. *Wichterman v. City of Philadelphia,* 2019 WL 3216609 *8 (E.D. Pa.). See also*, Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002) (failure to adequately train jail officials on how to deal with OCD stated a claim for constitutional deprivation). Contrary to Defendants' assertion (Motion to Dismiss, 19), the FAC identifies a "specific" policy these supervisory defendants were responsible for – the proper use of force and the training of Jail personnel in the proper use of Narcan.[19] FAC, ¶¶48, 53, 105, 123. The precise role of each in approving, acquiescing in or condoning this policy must be determined on a factual record, not on a motion to dismiss.

Further, Plaintiff has alleged that these Defendants are liable because they maintained or condoned an ongoing pattern and practice of failing to provide adequate medical care. This resulted in numerous deaths between 2012-2019 and included the failure to provide proper training to the Jail medical staff in the treatment of inmates such as Ms. DeVargas who were known to have OUD. The use of Narcan on Ms. DeVargas was part of this ongoing practice.  FAC, ¶¶24, 101, 103, 105, 123.  Plaintiff's pleading is sufficient to defeat the motion to dismiss as to these claims. *Russell v. Dominguez, supra.*

## C.      Defendant Olivares Is Not Entitled to Qualified Immunity

Defendants contend that Defendant is entitled to qualified immunity because there are no cases where ordering Narcan given to an inmate was found unlawful. Motion to Dismiss, 25.  In making their argument Defendants omit the material allegations in the FAC that Ms. DeVargas: 1) was not unconscious, unresponsive or in a state of respiratory arrest; 2) was verbally respon-

---

[19]     Discovery is required to determine the precise role that Defendant Olivares, as Medical Director of the Jail, played in the training provided to nurses and guards.

sive and physically active when Narcan was ordered; 3) expressly refused to consent to the treatment; 4) had unreasonable force applied to force her to ingest it; 5) suffered substantial physical and emotional pain, and 6) was thrown into opiate withdrawal, all as a result of Defendants' improper use of Narcan FAC, ¶¶44-48, 50, 53, 111,123. As noted at pages 35-37 above, all the cases involving the use of Narcan involve Narcan's proper use on **unconscious or unresponsive** persons, not on persons who were responsive and verbally and physically active.

As explained in Section V(C) above, there are circumstances where a plaintiff need not point to prior similar cases to defeat qualified immunity because "[t]he easiest cases don't even arise." *K.H. Through Murphy v. Morgan,* 914 F.2d. at 851 (7th Cir. 1990). "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. at 741. Just as there were no cases where an inmate had been tied to a post as punishment, there are no cases where Narcan was inflicted on a conscious, responsive, physically active person, and/or where it was forcibly inflicted in a manner that caused a person severe pain and put them into dangerous and painful opiate withdrawal. The forced application of Narcan under the circumstances alleged in the FAC is so outrageous that no one would do so.[20] The absence of a prior case similar to this "speaks not to the unsettledness of the law but to the brashness of the conduct." *Bellotte v. Edwards,* 629 F.3d 415, 424 (4th Cir. 2011).

As in *Hope v. Pelzer,* "the state of the law" in 2019 gave Defendants "fair warning that their alleged treatment" of Ms. DeVargas was unconstitutional. By 2019, it was clearly established that a pretrial detainee had a right to be free from objectively unreasonable force, *Kingsley, supra,* which included the right to be free from forcible restraint in the absence of penological/law enforcement reasons that were legitimate **under the circumstances.** *Blackmon v. Sutton,*

---

[20]   All the internet sites that discuss the use of Narcan, and there are many, make it clear that it is not to be used on persons who are not unconscious, unresponsive or in or near respiratory arrest.

734 F.3d at 1242. Likewise, Defendants' responsibility to provide adequate medical care was well established. *Estelle v. Gamble,* 429 U.S. 97 (1976). Defendant Olivares had "fair warning" that his alleged conduct was unconstitutional and he is not entitled to qualified immunity.[21]

**D.**   **Plaintiff States a New Mexico Tort Claims Act Violation Under §41-4-12 as to the Improper Administration of Narcan.**

Defendants do not move to dismiss the battery claim against Defendant County. Instead, they focus on dismissal of a battery claim against Dr. Olivares.  Motion to Dismiss, 30. There are two problems with Defendants' argument.  First, Plaintiff did not make a battery claim under state law against Dr. Olivares.  This claim is against Santa Fe County on the basis of the conduct of its law enforcement officers at the Jail using excessive force to administer Narcan on Ms. De-Vargas. FAC, ¶¶129, 133, 137.  Second, their contention that Defendant Olivares is not a law enforcement officer within the meaning of §41-4-12 NMSA (1978) is irrelevant as to the battery claim against Defendant County for the manner in which Narcan was administered. Defendant's guards who used excessive force in administering Narcan were law enforcement officers acting within the scope of their duties at the time they committed the battery (FAC, ¶¶43, 125, 129), and Defendant County is liable under *respondeat superior*. *Weinstein v. City of Santa Fe,* 1996-NMSC-021, ¶7. There is no need to name the individual guards. *Lopez Sr. v. Las Cruces P.D.* 2006-NMCA-074, ¶9. The assertion that Plaintiffs fail to state a claim for violation of the State Constitution is also without merit because §41-4-12 expressly waives immunity when a law enforcement officer causes the deprivation of a right secured by the New Mexico Constitution. *California First Bank*, ¶26. Defendants' Motion is not well taken as to these claims and should be denied.

---

[21]   Indeed, outside the jail context, forcing medical treatment on a patient who does not consent to it is a battery. *Gerety v. Demers,* 1978-NMSC-09, ¶52.

**VII.  Plaintiff Properly Alleges that Defendant County's Refusal to Provide Ms. DeVargas and other Inmates Essential Treatment for their Opioid Use Disorder Violated Title II of the Americans With Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fourteenth Amendment.**

Plaintiff alleges that Defendant County's failure to provide a Medical Assistance Treatment program ("MAT") for inmates violated 42 U.S.C.§ 12132 ("ADA") and 29 U.S.C.§794 ("§504") and the Fourteenth Amendment rights of Ms. DeVargas. FAC ¶¶112(A),113-118.  OUD is a chronic disease of the brain that afflicts large numbers of persons in the County and at the Jail. Opioid use was declared a national emergency in 2017. The risk of death from OUD is higher in New Mexico than in the rest of the country. The use of Suboxone and/or Methadone to treat OUD is now widespread and is considered the most effective medications for its treatment. FAC, ¶¶26-32.

These medications not only ease the drastic immediate consequences of withdrawal but also prevent the many deaths that occur from overdoses after inmates who have undergone unmedicated withdrawal are released from jail.[22]  FAC, ¶¶33-34. A MAT program utilizes these medications and is considered the "best practice" in treating OUD. It has been implemented in the Bernalillo County Detention Center and more than 70% of the inmates introduced to the program continued treatment after release. A 2013 University of New Mexico study confirmed its benefits.  In 2017, the National Sheriff's Association and the National Commission on Correctional Health Care urged jail administrators across the country to implement "the now-standard MAT."   MAT was found to be "the most current evidence-based substance abuse disorder treatment within their jails to respond to the opioid and drug epidemic" and guidelines were issued

---

[22]   By September 2019 it was well known that in the two weeks after release from jail inmates are 12 times more likely to die -- and 129 times more likely to die of an overdose -- than the general population.  Forced abstinence behind bars without MAT means addicts are released with a lower tolerance and an increased urge to use, both of which result in deaths from overdosing. FAC, ¶34.

41

for the use of Suboxone and Methadone to treat persons with OUD.  The Johns Hopkins School of Public Health found life-saving benefits to the use of MAT programs in jails, *inter alia* because under a MAT program inmates are not required to undergo the painful, sometimes fatal process of withdrawal. It concluded that given the evolving standards based on current knowledge, the use of MAT programs in jail settings was a "best practice" and that the denial of such treatment to inmates suffering from OUD may well be a denial of adequate medical treatment. FAC, ¶¶26-32.

Defendant had a long custom and practice of failing to provide adequate medical care and was required to enter into a Settlement Agreement with the DOJ in 2008 because of this. After the political hiring of Defendant Sedillo, inmate medical care continued to deteriorate and caused the death of least 7 inmates during the 2012-19-time period, including at least deaths five that involved persons known to suffer from OUD. FAC, ¶¶17-24, 103.

The FAC alleges that Defendant knew: 1) there was widespread opiate addiction in the Jail; 2) a high percentage of inmates suffered from OUD; 3) IV drug users with OUD who were not provided proper medical care to treat their addiction will seek out illegal drugs due to fear of withdrawal pain; 4) there was widespread use of illicit drugs within the Jail which presented a grave danger to the health and safety of the inmates (the use was so widespread that inmates reportedly held heroin parties); 5) the sale of drugs for use in the Jail was facilitated by guards and during 2015-2019 numerous inmates and guards had been arrested for distributing heroin and non-prescription Suboxone in the Jail; and 6) a significant number of inmates had died or nearly died while in the Jail from overdoses, withdrawal, and/or suicides related to withdrawal or overdose. FAC, ¶¶28, 33, 66, 102, 112(b).

In 2018, experts called upon Defendant County to provide a MAT program for inmates with OUD. In May 2019, Defendant County's Health Planning and Policy Commission met with

Defendant Board of Commissioners and urged Defendant to implement a MAT program. Dr. Laura Brown, a recognized expert in the treatment of addiction patients, explained that providing opioid-based medication to treat inmates with suffering from OUD was "the national standard of care." Defendant was told the use of opioid-based medications was superior in terms of saving inmates' lives, reducing health care costs, and achieving better rates of recovery and without it Defendant was "not providing appropriate medication-assisted treatment." FAC, ¶¶28, 36, 37.

Despite this knowledge, as of September and October 2019, Defendant refused to implement such a program. FAC, ¶38.  In contrast, Defendant had a practice and policy to treat all other serious disorders from which inmates were known to suffer.  OUD was the one serious disorder that Defendants refused to treat. FAC, ¶39.

On or about September 20, 2019, Defendant's medical staff learned that Ms. DeVargas had recently seen Dr. Craig "to get clean" and for seizures, that Dr. Craig was treating Ms. DeVargas for her addiction, and that on August 27, 2019 Dr. Craig had given her a prescription for Suboxone. She was not using illegal drugs at this time. FAC, ¶59. Because Defendant had no MAT program, Ms. DeVargas was not provided any treatment for her OUD.  FAC, ¶¶65, 112(a).[23]

Ms. DeVargas's OUD constituted a chronic disability. As with many other chronic disabilities and diseases, OUD involves cycles of relapse and remission. Without treatment or other recovery, OUD may result in premature death. FAC, ¶113.[24]

---

[23]   As described above, when Ms. DeVargas first entered the Jail Defendants made her condition much worse by putting her into withdrawal as a result of forcibly administering Narcan in the total absence of medical justification.  Defendants refused to treat her disease with MAT but merely attempted to treat the symptoms of withdrawal by, *inter alia*, giving her Librium, a drug not approved for treating opiate withdrawal. FAC, ¶¶42, 44-48, 54, 57, 65, 112(a).

[24]   According to the Centers for Disease Control and Prevention, Opioid Use Disorder kills over 100 Americans every day. More than 500,000 people in the United States have died from opioid overdose over the past 20 years and that rate increased during the five years prior to 2019.

In an effort to deal with the pain and agony that persons with OUD suffer during withdrawal, Ms. DeVargas, like many persons suffering from OUD who cannot get Suboxone (or Methadone), sought and obtained illicit Suboxone. This, along with other illicit drugs, was readily available in the Santa Fe County Jail.  At the Jail Ms. DeVargas used Suboxone by intravenous injection to deal with the pain and other consequences of withdrawal. FAC, ¶¶65, 66.

Ms. DeVargas injected illicit drugs at the Jail because Defendant, as a matter of policy or custom, refused to treat her OUD with MAT. FAC, ¶¶99, 112(a), 112(b).  Ms. DeVargas died as a direct result of sepsis which was secondary to the MRSA infection she received at the Jail, most likely from a dirty needle she used to self-medicate herself in order to try and curb the pain of opiate withdrawal.

Plaintiff alleges that Defendant failed to provide Ms. DeVargas with the necessary treatment because of her disability (OUD), had a blanket policy or custom to deny her (and other inmates) treatment for OUD through a MAT program, routinely treated other disabilities with more appropriate medical care, and singled out OUD as the sole disability it would not treat. Defendant County discriminated against Ms. DeVargas by completely denying her necessary medical service and treatment because of her disability. This conduct was a direct cause of her death. FAC, ¶117.

Defendant's refusal to provide Ms. DeVargas with Suboxone as prescribed by her doctor before her arrest also intentionally denied her a reasonable accommodation for her disability to which she was entitled under the ADA and Section 504.[25] Without this accommodation, Defendants deprived her of the best, most effective and most practical form of treatment shown to be effective at managing her disability and unlawfully denied her meaningful access to Defendant's

---

[25]  The FAC alleges that Defendant is a recipient of federal financial assistance within the meaning of these statutes.  FAC, ¶13.

Jail health care services and other programs available to other inmates. FAC, ¶118.

**A.      Plaintiff States a Claim that Defendant County Violated the ADA and Section 504.**

Defendant County does not dispute that Plaintiff properly alleges that Ms. DeVargas was a qualified, disabled individual under the ADA or Section 504. Rather, it asserts its failure to implement a MAT program to treat her disability does not violate either the ADA or Section 504 because Defendant had a policy or custom to deny all persons with OUD such treatment and therefore Ms. DeVargas was not personally discriminated against or denied the benefit of any service. Motion to Dismiss, 26-27.

A jail engages in disparate treatment discrimination in violation of the ADA when it fails to provide medication because of an individual's disability. Medical care is a "service" provided by the Jail within the meaning of the ADA.  *Pesce v. Coppinger* 355 F.Supp.3d 35, 40 (D. Mass. 2018).  The *Pesce* court noted testimony that "as with other chronic diseases, opioid use disorder involves cycles of relapse and remission" and that "[w]ithout treatment or other recovery, opioid use disorder may result in disability or premature death." *Id.* The court further held the jail's denial of methadone to treat plaintiff's disability (OUD) -- because it had a blanket policy not to treat anyone for OUD -- was unlawful.[26] Id. at 47-48. "Absent medical or individualized security considerations underlying the decision to deny access to medically necessary treatment, Defendants' policy as applied to Pesce is either 'arbitrary or capricious -- as to imply that it was pretext for some discriminatory motive' or 'discriminatory on its face,'" and for either reason violated the ADA . *Id*. at 47 (citations omitted)

In *Smith v. Aroostook Cty.,* 376 F.Supp.3d 146, 150 (D. Maine 2019), *aff'd. Smith v. Aroostook Cty.,* 922 F.3d 41 (1ˢᵗ Cir. 2019), the court found that "given the well-documented risk

---

[26]  Defendant cites no cases holding that these statutes are not violated if an entity has a blanket policy to deny medical treatment for a particular disability to "qualified individuals," including Ms. DeVargas, who have that disability.

of death associated with opioid use disorder, appropriate treatment is crucial." The court held de-fendant's "out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication—**and the general practice that precipitated that denial**—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability," i*d.*, 159-160 (emph. added), thereby denying the plaintiff the benefit of the jail's health care program in violation of the ADA. See also*, Pesce,* 355 F.Supp.3d at 47.

An inmate is discriminated against because of her disability in violation of the ADA and §504 occurs where, as alleged in this case, a jail denies her the immediate access to prescribed and/or required medications and provides such service to detainees in need of prescriptions for other illnesses. *McNally v Prison Health Services,* 46 F.Supp. 2d. 49,58 (D. Maine 1999).  See also*, Rave v. Bd. Of Comm'rs for County of Bernalillo, supra*, 2017 WL 3600452 *7.

Defendants' reliance on *Hickey v. Tompkins,* 2021 WL 858439 (D. Mass) is misplaced. That case was decided on **summary judgment after the development of a factual record** and is inapposite to the instant motion to dismiss.  Moreover, in *Hickey* the jail was providing MAT treatment to the plaintiff.  The issue before the court was whether the **temporary delay** in pro-viding that treatment while the jail resolved security and logistical issues associated with the pro-gram was so unreasonable as to suggest discrimination against the plaintiff because of his dis-ability.  The court held it was not and that "[a]ny inference that the denial of Suboxone was moti-vated by animus towards those addicted to opiates is rebuffed by the fact defendants are currently providing Hickey with that drug." *Id.*, *7*.  In this case, it is alleged that Defendant did not treat Ms. DeVargas's OUD with MAT because it refused to provide treatment for that disability at all.[27]

---

[27]   Defendant also cites to *Niemic v. U Mass Corr. Health,* 89 F.Supp.3[d] 193 (D. Mass. 2015). That case is also inapposite. Decided on summary judgment, it was not an ADA or §504 case. Second, the case was decided years before Massachusetts's jails implemented MAT programs.

Additionally, Defendant's refusal to provide Ms. DeVargas the Suboxone prescribed by her doctor shortly before her arrest, the only form of treatment shown to be effective at managing her disability, constituted a denial of a reasonable accommodation for her disability to which she was entitled under the ADA and Section 504. *Smith, supra,* 376 F.Supp. 3d. at 160-61. Without this accommodation, Defendant unlawfully denied her meaningful access to the Jail's health care services, services that were available to inmates suffering from any and all other chronic diseases. FAC, ¶¶117, 118.

Defendant also moves to dismiss Plaintiff's §504 claim because it asserts that alleging an entity is a recipient of federal financial assistance is merely conclusory and not a sufficiently pled factual allegation.  Motion to Dismiss, 26-27. Defendant cite*s* no case in support of dismissing a §504 claim at the pleadings stage for that reason.  Defendant admits at n. 6, that it receives federal financial assistance for the Jail. The amount and purpose of that federal financial assistance can only be determined after the development of a factual record.

**B.** **Plaintiff States a Claim that Defendant County's Failure to Provide a MAT Program Violated Ms. DeVargas's Fourteenth Amendment Right to Adequate Medical Treatment. [28]**

Defendant argues that Plaintiff fails to state a claim that Ms. DeVargas's Fourteenth Amendment right was violated by its failure to treat her serious medical condition, OUD, with

---

See, *e.g.*, *Pesce,* and *Hickey.* Third, the *Niemic* plaintiff did not allege the jail discriminated against a class of inmates, *i.e.*, those with OUD, but alleged his right to equal protection was violated because **non-prisoners** could obtain treatment with Suboxone and methadone. "It is simply inapposite to compare the treatment options available to those who are not incarcerated with those who are incarcerated, as those two groups are not similarly situated[.]" *Niemic,* at 211.This is not the claim in this case. Moreover, after *Smith, supra,* the validity of this *pro se* case is highly questionable.

[28]   Plaintiff asserts this claim against Defendant County only who is not entitled to qualified immunity.  *Owen v. City of Independence, Mo*., 445 U.S. 622, 638 (1980).  It was Defendant County's policy, implemented by Defendants Williams, Sedillo, and/or Olivares in their official capacities, that caused this injury.  Suits against these employees in their official capacity are considered suits against the County. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)

treatment that was the standard of care to treat that disease (MAT). Defendant first argues that Ms. DeVargas did not have an active prescription for Suboxone at the time she was booked and therefore had no right to have her disease treated with Suboxone. Motion to Dismiss, 13. Defendant fails to view the facts alleged and the inferences that may reasonably be drawn from them in the light most favorable to Plaintiff and, instead, improperly draws inference favorable to itself.

Defendant County knew that Ms. DeVargas was an IV drug user suffering from OUD. FAC. ¶¶42, 57. On September 20, 2019, Defendant's Medical Director learned Ms. DeVargas was being treated by Dr. Craig for her addiction and had been given a prescription for Suboxone shortly before her arrest. FAC, ¶59. With no support in the FAC, Defendants improperly infer that the August 27, 2019 prescription was not active on September 20, an inference in Defendants' favor that cannot be made in a motion to dismiss.  By ignoring the treatment recently prescribed for Ms. DeVargas by her doctor, Defendants violated her Fourteenth Amendment rights. *Pesce,* 355 F.Supp.3d, at 47; *Estate of Unborn Child of Jawson v. Milwaukee Cty.,* 2020 WL 4815809 *4 (E.D. Wis.). That violation was caused by the fact that Defendant Santa Fe County had a policy or custom of refusing to treat OUD with Suboxone or Methadone even though those were the only medications known to be effective in treating the disease. FAC, ¶¶101, 105, 108, 112(a).

The material facts alleged are that Defendant knew Ms. DeVargas suffered from OUD, she had a recent prescription from her doctor for Suboxone, Suboxone (or Methadone) were the only treatments for that disease that were known to be effective for OUD, and Defendant refused to treat her with it. Whether the August 27 prescription may have expired is completely irrelevant here.

Defendants wrongly assert that this claim must be dismissed because Plaintiff did not allege that Ms. DeVargas's physician indicated that she needed Suboxone to treat her OUD while

in jail. Motion to Dismiss, 15.  This is meritless. The FAC alleges that Defendant knew that Ms. DeVargas suffered from OUD, that she had gone to Dr. Craig for treatment of her disease, and he had given her a prescription for Suboxone only weeks earlier. FAC¶¶57,59. Defendant's medical staff was thus on notice that she needed appropriate treatment for her disease and that treatment with Suboxone or Methadone was the only treatment proven effective.[29] Viewing the facts alleged in the light most favorable to Plaintiff, it can and should be inferred from the fact that Dr. Craig prescribed the drug on August 27, 2019, that he believed Ms. DeVargas still needed Suboxone to manage her disease three weeks later.

Because OUD is well-recognized as a serious disease, *Smith v. Arooostook County, supra*, the salient fact is that once Defendant knew Ms. DeVargas suffered from OUD, its failure to provide her with the only treatment known to be effective constituted deliberate indifference to her serious medical needs. Even if she had not recently obtained a prescription for Suboxone, once Defendant knew Ms. DeVargas suffered from a serious medical condition, it was required to provide treatment that met the standard of care for that condition. *Estate of Unborn Child of Jawson v. Milwaukee Cty.,* 2020 WL 4815809 *5.  It is alleged that Dr. Craig had diagnosed her condition and it is beyond cavil that OUD requires treatment. In fact, the need to treat opiate addiction is so obvious that even a layperson would easily recognize the necessity for treatment. Because Defendant's Medical Director knew that Ms. DeVargas had a serious medical condition that required treatment but failed to treat it, it may be inferred that he knew the failure to provide the treatment needed created a substantial risk of harm and failed to act despite that knowledge.

---

[29]   Notably, Defendant's argument actually supports Plaintiff's ADA and Section 504 discrimination claims. It is unimaginable that Defendant would deny appropriate treatment to an inmate it learned had diabetes or hypertension or HIV, regardless of whether the inmate had a prescription for the needed medication or what the inmate's doctor, if he or she had one, thought about the benefits of insulin for diabetes or blood pressure medication for hypertension. Plaintiff alleges that only inmates such as Ms. DeVargas who suffer from OUD were denied treatment on account of their disability. FAC, ¶¶116-118.

*Gonzales v. Martinez,* 403 F.3d 1179, 1183 (10th Cir. 2005). The allegations in the FAC satisfy both the objective and subjective elements required for such a claim.

The FAC alleges that Ms. DeVargas was not provided with **any** treatment for her OUD. Defendants argue that dismissal is required because they placed her on a five-day "tapering off period" with Librium and several other medications to ease the symptoms of opioid withdrawal -- a situation caused by Defendant's employees forcing her to involuntarily inhale Narcan. Defendants wrongly claim treating the symptoms of withdrawal is simply another method of treating OUD and that Plaintiff merely disagrees with that method. Motion to Dismiss, 13-14.  However, treating the symptoms of a disease is not the same as treating the disease. *Smith,* 376 F.-Supp.3d at 152 ("The withdrawal protocol is not a treatment for opioid use disorder").[30]  Plaintiff alleges not simply a disagreement in treatment, but a complete failure to treat her disability.

It is difficult to imagine Defendants would argue that treating the symptoms of cancer with pain medication is the same as treating the disease with radiation or chemotherapy, and Defendants cite no case holding that treating the symptoms of opiate withdrawal constitutes treatment for the disease of OUD.  Nor does Defendant even try to explain how treating symptoms of opiate withdrawal is the same as treating the disease of opioid addiction. This was an argument advanced by the defendants and rejected by the court in *Smith, supra.*[31]

The case law cited by Defendants is inapposite.  While Defendants cite to *Hickey, supra,* as explained above, that case did not involve a refusal to provide any MAT treatment, but simply the legality of a temporary delay in providing that treatment.

Defendants' reliance on *Chamberlain v. Va. Dep't of Corr.,* 2020 WL 5778793 (W.D. Va)

---

[30]   Moreover, Librium is not even approved as a drug to treat opiate withdrawal. FAC, ¶54.

[31]   Plaintiff could locate no cases holding that failing to treat any other chronic illness while merely attempting to treat symptoms constitutes the provision of adequate medical services.

(on appeal) is also misplaced. First, that case was decided after the development of a factual record. Second, the case is not similar. The plaintiff there had been prescribed an oral version of naltrexone. Unlike Librium, naltrexone is a drug used to treat opioid addiction, not merely to ease withdrawal symptoms. The plaintiff (Chamberlain) stopped taking the medication within a week, saying it made him feel weak. Additionally, there was expert testimony from a psychiatrist that Chamberlain did not need Suboxone or methadone. The court based its grant of summary judgment on these two facts. *Id.,* *4. The court distinguished the case from *Smith, supra,* and *Pesce, supra,* stating: "Most significantly though -- and unlike the plaintiffs in these other cases -- Chamberlain has not presented any **medical testimony** to support his assertion that he needs MAT to treat his OUD." *Id.*, at *6 (emph. added).

In this case, there is no allegation that Ms. DeVargas stopped taking medication provided by Defendant to treat her OUD. Rather, Plaintiff alleges that Ms. DeVargas was not provided any medication to treat her OUD. Moreover, there are no allegations that a medical expert concluded that Ms. DeVargas did not need Suboxone to treat her disease. Rather, the FAC alleges her doctor had recently prescribed Suboxone for that purpose. Most importantly, *Chamberlain* was decided on summary judgment, based on the lack of medical testimony to support the assertion that the plainitff needs MAT to treat his OUD.  Plaintiff will present such testimony here. Defendants seek dismissal without allowing Plaintiff the opportunity to present evidence to the Court and *Chamberlain* does not support this effort.

Defendants claim that because the FAC does not explain how treating the symptoms of withdrawal was an inadequate treatment for Ms. DeVargas's OUD, this requires a finding that Plaintiff cannot establish deliberate indifference. Motion to Dismiss, 15.  As explained above, the FAC alleges that Defendant did nothing to treat the disease and deprived Ms. DeVargas "of the only form of treatment shown to be effective in managing her disability." Treating the symptoms

of withdrawal is not a treatment for OUD. *Smith, supra.* Plaintiff will present evidence in the form of expert medical testimony explaining why treating withdrawal symptoms is not treating OUD and there is no basis for dismissing this claim because the FAC does not contain a description of that evidence. Significantly, *Smith, supra, Pesce, supra, Hickey, supra,* and *Chamberlain, supra,* were all decided on a factual record.

Finally, Defendants' assertion that Plaintiff fails to allege facts setting forth a claim that Ms. DeVargas' constitutional rights were violated as a result of a policy of Defendant County is meritless. Motion to Dismiss, 15. When the execution of a government policy or custom is a cause of the injury a municipality may be held liable under §1983. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). The custom need not be formally approved. *Monell v. NYC Dept. of Health,* 436 U.S. 658, 690-91 (1978). The FAC alleges that the underlying due process violation described above occurred because "Defendants as a matter of policy and/or custom refused to provide any treatment through a MAT program despite being told that it was the current standard of care for persons suffering from OUD" (FAC, ¶112(a)), that Defendants had a practice and policy of treating all other serious disorders from which inmates were known to suffer, that OUD was the one serious disorder that Defendant refused to treat, and that Defendant acted with deliberate indifference. FAC, ¶¶39, 105. The FAC sufficiently alleges that Ms. DeVargas's Fourteenth Amendment rights were violated due to a policy of refusing to treat inmates suffering from OUD through a MAT program. *Estate of Unborn Child of Jawson v. Milwaukee Cty,* 2020 WL 4815809 *6.

## CONCLUSION

When Carmela DeVargas was booked into the Santa Fe County Jail on September 19, 2019, she was a 34-year-old mother of two who suffered from OUD but was otherwise healthy. Within a month, she was on life support and quadriplegic as a result of a MRSA infection ac-

quired at the jail that went undiagnosed and untreated by Defendants.  Shortly thereafter, with no

hope of improvement, she made the decision to have the life support removed and died. Ms. De-

Vargas died as a direct result of the grossly inadequate medical treatment she received at the jail.

Moreover, during that time Defendants subjected her to physical and emotional abuse without

any legitimate basis. Facts supporting all of Plaintiffs' federal and state law claims are properly

alleged in the FAC.  Consequently, Defendants' Motion to Dismiss is not well taken and should

be denied in its entirety.

Respectfully Submitted,

*/S/ RICHARD ROSENSTOCK*
Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, New Mexico 87501
505-988-5324
richard.rosenstock@gmail.com

Daniel Yohalem
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-9433     Fax: (505) 989-4844
daniel.yohalem@gmail.com
**During Covid:   (505) 690-2193**

Katherine Murray
Post Office Box 5266
Santa Fe, New Mexico 87502
505-670-3943
kemurraylaw@gmail.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Response Opposing Defendants' Motion to

Dismiss was filed and served electronically via CM/ECF on May 31, 2021 to all counsel of

record:

Jonlyn M. Martinez
P.O. Box 1805
Albuquerque, NM 87103-1805
(505) 247-9488
jonlyn@jmartinezlaw.net

*Attorney for Defendants Santa Fe County, Sedillo, Williams, Rios and Rojas*

Christa Hazlett
Conklin Woodcock & Ziegler
320 Gold Ave SW
Albuquerque, NM 87102
(505) 224-9159
cmh@conklinfirm.com

*Attorney for Defendant Olivares*

*/S/KATHERINE MURRAY*
Katherine Murray
Post Office Box 5266
Santa Fe, New Mexico 87502
505-670-3943
kemurraylaw@gmail.com

*Attorney for Plaintiff*
