## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANTONIO DEVARGAS, as the Personal
Representative of the Estate of Carmela DeVargas,
Deceased, and A.D., by and through his Adoptive
Father and Next Friend Antonio DeVargas,

       Plaintiffs,

v.                                                                      No. CIV 21-0271 RB/SCY

THE BOARD OF COUNTY COMMISSIONERS
FOR SANTA FE COUNTY, and PABLO SEDILLO
III, DEREK WILLIAMS, MELQUIADES OLIVARES,
LIEUTENANT ROJAS, and CAPTION RIOS, in their
Individual Capacities,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

Carmela DeVargas, a young mother of two, entered the Santa Fe County Detention Center

(the jail) as a pretrial detainee in September 2019. DeVargas, an IV drug user who suffered from

Opioid Use Disorder (OUD), reported that she did not feel well and had "done a bad batch of

drugs." Against her protests, jail staff forcibly administered Narcan, a medicine used to treat a

suspected opioid overdose. DeVargas experienced withdrawal symptoms due to the Narcan, and

medical staff prescribed medications to treat her symptoms. They did not, however, prescribe her

medications such as methadone or Suboxone, which are more effective in reducing drug cravings.

DeVargas eventually obtained illicit Suboxone and self-administered it via a needle. Antonio

DeVargas (DeVargas's father and the Personal Representative of her Estate) alleges that DeVargas

developed an infection, either from using a dirty needle to administer Suboxone or from filthy

conditions at the jail. She was transferred to a hospital in October 2019. DeVargas's health

deteriorated, and she died in November 2019.

DeVargas's father and her minor child, A.D. (Plaintiffs), now bring state and federal claims against medical and jail staff, the County, and the County's Public Safety Director. Defendants move for partial dismissal of the claims. The Court will grant the motion to dismiss in part.

I.      **Statement of Facts**

   A.      **Facts Regarding Operation and Maintenance of the Jail**

Defendant Board of County Commissioners of Santa Fe County (the County), which receives federal financial assistance, is responsible for operating and maintaining the jail. (Doc. 5 (FAC) ¶¶ 5, 13.) Plaintiffs allege that the County hires, retains, trains, supervises, and disciplines the Santa Fe County Public Safety Director and other jail staff, including the individually-named defendants in this case. (*Id.* ¶ 5.) Plaintiffs name five individual defendants: (1) Pablo Sedillo III, Santa Fe County's Public Safety Director, who oversees the jail's operations and has "general supervisory authority over all detention center employees" (*id.* ¶ 6); (2) Derek Williams, warden of the jail, who is responsible for the jail's operation and maintenance, including medical care for its inmates (*id.* ¶ 7); (3) Melquiades Olivares, the jail's Medical Director and physician (*id.* ¶ 9); (4) Lieutenant Rojas and (5) Captain Rios, both correctional officers (COs) at the jail (*id.* ¶ 10).

Plaintiffs assert that the jail suffers from "a long history of deliberate indifference to the medical care to inmates." (*Id.* ¶ 16.) In 2003, the United States Department of Justice (DOJ) investigated and found that the jail offered "improper and inadequate medical care" to inmates, with problems "in the areas of intake, screening, referral, acute care, chronic care, and medical administration and management; that there was an improper delay in responding to inmate requests for medical treatment that put [inmates] at risk for worsening illness; and that often the treatment provided was substandard." (*Id.* ¶ 17.) The DOJ further found that the "[j]ail failed to maintain safe hygiene practices and . . . to take reasonable steps to control the spread of blood borne

pathogens[,]" including Methicillin-resistant Staphylococcus Aureus (MRSA). (*Id.* ¶¶ 19, 21.) In 2008, the DOJ and the County entered into a Settlement Agreement that required the County to put certain clinical guidelines into place to address the problems. (*Id.* ¶ 21.)

The County hired Sedillo as County Public Safety Director in 2012. (*See id.* ¶¶ 22–23.) Plaintiffs assert the quality of medical care has deteriorated under Sedillo. (*Id.* ¶ 24.) Plaintiffs provide four[1] examples of inmates who have died after receiving inadequate medical treatment at the jail: (1) in 2012, Eusema Rodriguez, an opiate addict, died several days after she was booked into the jail and "after vomiting blood for hours"; (2) in 2014, "Breanna Vasquez died of a meningitis infection within days after being booked" into the jail; (3) in 2016, Ricardo Jose Ortiz, who jail staff knew suffered from OUD, went into withdrawal, was denied medical treatment, vomited blood in the presence of a guard, and died three days later; (4) also "in 2016, John DeLaura died from alcohol withdrawal shortly after being booked at the jail." (*Id.*)

### B.    Facts Relevant to Medication-Assisted Treatment of OUD

Plaintiffs assert that OUD is "recognized as a chronic disease." (*Id.* ¶ 26.) "The risk of death from opioid addiction has been well-documented and appropriate treatment for this disease exists and is crucial to preventing unnecessary deaths." (*Id.*) The Medication-Assisted Treatment program (MAT), which utilizes medications such as Suboxone or methadone together with behavioral therapy, is highly effective in treating OUD. (*See id.* ¶¶ 28–29, 31–32.) In 2017, the National Sheriff's Association and the National Commission on Correctional Health Care "urged jail administrators across the country to implement" MAT programs in all facilities, calling "MAT the most current evidence-based substance abuse disorder treatment within their jails to respond

---

[1] Plaintiffs also mention 17-year-old Desiree Gonzales, who died at the Santa Fe County Juvenile Detention Center following a drug overdose. (FAC ¶ 24.) As Plaintiffs do not explain why a death at the juvenile facility relates to the factual allegations here, the Court will disregard the allegation for purposes of this Opinion.

to the opioid and drug epidemic." (*Id.* ¶ 30.) Plaintiffs assert that in "2019, Defendants knew there was a high percentage of inmates [at the jail who] suffered from [OUD]" and that "there was widespread and illicit use of opioid drugs within the [j]ail by these inmates." (*Id.* ¶ 33.) Plaintiffs further allege that from 2015–2019, "numerous arrests had been made of both inmates and guards for distributing heroin and other illegal drugs inside the [jail], including non-prescription Suboxone." (*Id.* ¶¶ 33, 102.) In May 2019, "the Santa Fe County Health Policy and Planning Commission called on the [County] to implement the use of Suboxone and methadone in the treatment of inmates who have [OUD]." (*Id.* ¶ 36.) The Commission informed the County that the jail, which offered non-opioid medications, was "not providing appropriate medication-assisted treatment." (*Id.*) The jail's treatment "force[s] inmates to . . . undergo a painful and potentially dangerous period of withdrawal . . . ." (*Id.*) Despite these recommendations, the County, Sedillo, and Williams have refused to implement a MAT program. (*Id.* ¶ 38.)

Plaintiffs also allege that Defendants maintain the jail "in an unsafe and non-hygienic manner" that results in "widespread and rampant MRSA infections, many of which [have] resulted in inmates' serious illness, hospitalization, and/or death." (*Id.* ¶¶ 40, 100.) Specifically, "the cleaning surface[s] in the common areas and in the sinks and toilets in the cells were not properly disinfected." (*Id.* ¶ 102.) "[A]t least two other inmates, Rex Corcoran and Ronald Trujillo, suffered MRSA infections in the same . . . three-week period that Ms. DeVargas was" housed at the jail "and were not properly treated . . . ." (*Id.* ¶ 103.) Mr. Corcoran died, and Mr. Trujillo's foot was amputated due to inadequate medical treatment. (*Id.*)

### C.     Facts Relevant to DeVargas's Detention, Illness, and Death

DeVargas was arrested for an alleged probation violation on September 19, 2019, and booked into the jail as a minimum risk inmate. (*Id.* ¶ 42.) Jail staff learned during the booking

process that DeVargas "was an IV drug user suffering from [OUD]." (*Id.*) Jail staff placed DeVargas on "Dry Cell status in the Medical housing area, allegedly for refusing to cooperate with a strip search and for having an abnormal scan." (*Id.* ¶ 43.) Shortly after she was booked into jail, a CO (Lieutenant Mangin) saw DeVargas "straddling the toilet with her head directly over the sink." (*Id.*) Mangin tried to talk to DeVargas, "but she did not respond to him." (*Id.*) Nurse Deanne Mares and three additional COs responded to Mangin's request for help. (*Id.*) DeVargas told Mares that she had stomach pain, did not feel well, "and had done a bad batch of drugs." (*Id.* ¶ 44.) DeVargas was conscious, breathing, and responsive. (*Id.*) "Mares consulted with . . . Olivares who ordered or concurred that Narcan[2] be administered . . . ." (*Id.*) DeVargas told Mares and the COs that she did not want to take Narcan "because she did not like the way it made her feel." (*Id.* ¶ 45.) The COs physically restrained DeVargas while Mares administered the Narcan. (*Id.* ¶¶ 46–47.)

Plaintiffs assert that Narcan "should only be administered if a person is unconscious, cannot be awakened, and is not breathing or is exhibiting very slow and shallow breathing." (*Id.* ¶ 48.) "Narcan . . . is not meant to take the place of emergency care" and should be accompanied by evaluation and observation by an emergency department. (*Id.* ¶ 52.) Plaintiffs allege that Olivares and "Mares did not know or follow the proper procedures for administering Narcan[,]" as evidenced by their failure to call 911. (*Id.* ¶ 53.) Narcan may induce severe withdrawal symptoms and other dangerous adverse side effects. (*Id.* ¶ 49.) The Narcan caused DeVargas to undergo withdrawal symptoms. (*Id.* ¶ 54.) "Olivares prescribed a five day 'tapering off' period with Librium, a drug commonly used for alcohol withdrawal but not an approved drug for treatment of opioid withdrawal, along with several medications to treat symptoms of

---

[2] Narcan "is a prescription medicine used for the treatment of a known or suspected opioid overdose emergency with signs of breathing problems and severe sleepiness or not being able to respond." *Narcan Nasal Spray*, https://www.narcan.com/ (last visited Oct. 10, 2021).

withdrawal . . . ." (*Id.*) Plaintiffs assert that the medications prescribed are not effective to treat opioid withdrawal and "fell below accepted standards in 2019" for such treatment. (*Id.*)

Medical staff gave DeVargas a physical examination on September 20, 2019, and found she was "completely normal" with "no complaints of chest, heart or abdominal pain." (*Id.* ¶ 58.) DeVargas informed Olivares and his staff that she was seeing a physician "to get clean" and for seizures, and the doctor had prescribed her Suboxone on August 27, 2019. (*Id.* ¶ 59.) DeVargas initially stayed in the medical housing unit, then transferred to general population in late September. (*Id.*)

On October 1, 2019, DeVargas completed a request for medical attention, complaining of stomach pain and small seizures. (*Id.* ¶ 60.) There is no record that medical staff examined or treated DeVargas for this complaint; they assumed "she was going through withdrawal."[3] (*Id.*) DeVargas was seen that same evening for superficial scratches, but Defendants did not treat her OUD. (*Id.*) DeVargas became increasingly ill and submitted several Health Service Requests from October 2–4, but she did not receive medical attention. (*Id.* ¶ 61.) She was taken to the medical unit at 7:30 p.m. on October 4, 2019, "sweating with fever" and suffering from "right side abdominal pain, flank pain[,] and nasal congestion." (*Id.* ¶ 62.) "[T]hese symptoms should have raised concerns by Defendants about the obvious risk that she had a serious infection, including endocarditis and/or an epidural abscess; [as a]dults with an unexplained fever, particularly IV drug users, often have life-threatening bacterial infections and are at elevated risk for endocarditis." (*Id.*) "A nurse gave [DeVargas] a Urinary Tract Infection test[,]" which was negative. (*Id.* ¶ 63.) Olivares did not examine DeVargas or order blood work or testing to determine if she had any kind of infection. (*Id.*) DeVargas stayed one night in the medical unit; she was released on October

---

[3] Medical staff knew that DeVargas experienced seizures as a withdrawal symptom. (FAC ¶ 57.)

5 and started an antibiotic the same day. (*Id.*)

At some point during her time at the jail, DeVargas intravenously injected illicit Suboxone to help her deal with her withdrawal symptoms. (*Id.* ¶ 66.) She spoke to a family member on October 17, 2019, and reported that she was "extremely ill" with a fever. (*Id.* ¶ 68.) She took ibuprofen, which brought her fever down for several hours, but she did not receive medical attention when she told a CO that evening that her fever had returned. (*Id.*) At 2:15 a.m. on October 18, DeVargas cried from pain and kicked at her cell door for attention, and a CO rushed her to the medical unit for her fever. (*Id.*) DeVargas told nursing staff that she had "back pain, sharp chest pain below her left breast, and shortness of breath." (*Id.* ¶ 69.) Staff gave her ibuprofen and Tylenol and sent her back to general population without performing any tests or blood work. (*Id.*)

DeVargas's condition grew worse, and staff initiated a "Code Blue, which designates a medical emergency usually involving respiratory or cardiac arrest," around 12:15 p.m. on October 18. (*Id.* ¶ 70.) DeVargas had severe chest pain and could not stand. (*Id.* ¶ 71.) On exam, DeVargas told Olivares that she was experiencing severe pain in her left chest/breast that prevented her from lying on her back and that it hurt to take a deep breath. (*Id.* ¶¶ 71–72.) She also informed him "that she was using illicitly obtained Suboxone intravenously . . . on a daily basis . . . ." (*Id.* ¶ 72.) Olivares described DeVargas's pain as "pleuritic[4] in nature." (*Id.*) He ordered an x-ray to be taken on October 22, 2019, but he did not order blood work or other testing. (*Id.* ¶ 73.) Olivares released DeVargas to her cell on the afternoon of October 18. (*Id.* ¶ 74.)

DeVargas's condition worsened, and she returned to the medical unit on the afternoon of October 19. (*Id.* ¶ 75.) She continued to complain of intense pain in her back and breast areas and

---

[4] "Pleurisy is a condition in which the pleura – two large, thin layers of tissue that separate your lungs from your chest wall – becomes inflamed." *Pleurisy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pleurisy/symptoms-causes/syc-20351863 (last visited Oct. 8, 2021).

tested positive for Suboxone. (*Id.*) Nursing staff took her vital signs, but no one ordered blood tests. (*Id.*) DeVargas's condition continued to decline, and at 12:15 a.m. on October 20, 2019, Olivares decided to transport her to a hospital. (*Id.* ¶ 76.) Staff took DeVargas to the Christus St. Vincent emergency room around 2:00 a.m. (*Id.*)

Emergency room staff examined DeVargas, took chest x-rays and blood tests, and put her on oxygen. (*Id.* ¶¶ 78–79.) Hospital staff assessed DeVargas with sepsis, acute hypoxia and left lower lobe consolidation (possibly related to pneumonia), thoracic back/neck pain, and opiate dependence. (*Id.* ¶ 80.) DeVargas transferred to the Intensive Care Unit approximately 24 hours later. (*Id.* ¶ 81.) She was intubated and placed on a ventilator at 4:18 a.m. on October 21, 2019. (*Id.*) The Critical Care/Pulmonary Disease doctor "recommended an infectious disease consultation." (*Id.*) Even though DeVargas was intubated and put in a sedated coma, jail staff, "acting pursuant to the direction of Defendants Rojas and Rios, placed mechanical restraints on her body." (*Id.* ¶ 82.) The hospital's medical director informed Rios that the mechanical restraints posed a risk of skin infection, but Rios refused to remove them. (*Id.*) The County agreed only to remove and readjust the restraints every two hours. (*Id.*)

On October 21, 2019, DeVargas was assessed with sepsis, pneumonia, and a MRSA infection. (*Id.* ¶ 83.) One doctor "noted that her history of IV drug use place[d her] at a high risk for meningitis." (*Id.*) DeVargas was alert and able to follow simple commands on October 21 and again on October 23. (*Id.* ¶¶ 83–84.) By October 24, 2019, DeVargas "had lost all feeling below her neck and could not move her arms or her legs." (*Id.* ¶ 86.) Her physician wrote that she was "severely quadriplegic" with an "anticipated dismal prognosis." (*Id.*) Until this time, Defendants had refused to notify DeVargas's family that she was ill. (*Id.* ¶ 88.) The hospital staff asked a CO to contact DeVargas's family "because her condition was dire." (*Id.* ¶ 89.) Rojas allowed

DeVargas's father, her sister, and her son to visit but did not allow any other family access. (*Id.* ¶¶ 89, 91–93.) Defendants kept DeVargas in leg and arm shackles "in case she decide[d] to run." (*Id.* ¶¶ 85, 91–92, 139.)

On October 26, 2019, DeVargas was alert and visited with her physician, who told her that her prognosis was grim: her options "were to disconnect the life support and . . . die almost immediately, or to transfer" to an out-of-state hospital "where she might be able to exist for an uncertain period of time on life support while quadriplegic." (*Id.* ¶¶ 91, 94.) DeVargas decided the next day that she would rather end her life than remain on life support as a quadriplegic. (*Id.* ¶ 95.)

On the evening of October 27, 2019, "Rios authorized the removal of restraints . . . ." (*Id.* ¶ 97.) DeVargas's criminal charges were also dismissed on that date. (*Id.* ¶ 98.) DeVargas was transported to another hospital, where she passed away on November 9, 2019. (*Id.* ¶¶ 98–99.) DeVargas "died as a direct result of sepsis which was secondary to the MRSA infection she got from either the filthy conditions at [the jail] or from a dirty needle she used to self-medicate while an inmate at the [jail]." (*Id.*)

### D.    Plaintiffs' Claims

Plaintiffs assert the following claims for relief:[5]

<u>Count I</u>: The County[6] was deliberately indifferent to DeVargas's medical needs by failing to implement a MAT program, by refusing to treat her OUD with Suboxone or a similar

---

[5] Although Plaintiffs' First Amended Complaint spans 46 pages and contains numerous detailed factual allegations, the claims for relief are unnumbered and lack clarity. For example, Plaintiffs often refer to "Defendants" without identifying which defendant they are naming in each claim. And in discussing their state tort claims, Plaintiffs reference four NMTCA sections but fail to distinguish what conduct falls under each section. The Court assigns numbers to each count for purposes of this opinion.

[6] Plaintiffs name the County, Sedillo, Williams, and Olivares in their claim regarding the MAT program and conditions of confinement but clarify in their response brief that the claim is brought only against the County. (*See* Doc. 21 at 12–13.)

medication, and/or by allowing the jail to remain in an unsanitary condition. Olivares was deliberately indifferent to her medical needs by ordering Narcan and by failing to examine or perform tests on DeVargas once she presented with symptoms of infection. The County and Olivares's conduct violated her Eighth and/or Fourteenth Amendment rights. (*Id.* ¶ 112.)

Count II: The County, Sedillo, Williams, Rojas, and Rios violated DeVargas's Eighth and Fourteenth Amendment rights by shackling her while she was hospitalized. (*Id.* ¶¶ 119–22.)

Count III: The County, Sedillo, Williams, and/or Olivares violated DeVargas's Eighth and Fourteenth Amendment rights when jail staff forcibly administered Narcan. (*Id.* ¶ 123.)

Count IV: The County violated DeVargas's rights under the ADA and Section 504 by failing to provide her with necessary treatment for her disability (OUD), which discriminated against her and denied her reasonable accommodation. (*Id.* ¶¶ 113–18.)

Count V: Plaintiffs bring state tort claims for negligence under N.M. Stat. Ann. §§ 41-4-6, 41-4-9, 41-4-10, and 41-4-12, and for unlawful seizure and/or unreasonable force under Article II, Section 10 of the New Mexico Constitution. (*Id.* ¶¶ 124–42.)

Count VI: A.D. brings a claim for loss of consortium against the County. (*Id.* ¶¶ 143–48.)

Defendants now move to dismiss Plaintiffs' claims brought under the Eighth and Fourteenth Amendments; the ADA and Section 504; any claim under the New Mexico Constitution and § 41-4-6; and any claim against Olivares under § 41-4-12. (*See* Doc. 10.)

## II. Legal Standards

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). The Court will "accept as true 'all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation omitted).

      **B.**    **Qualified Immunity**

"In assessing a qualified immunity defense" in the context of a motion to dismiss, the Court "must determine whether the plaintiff pled facts indicating: (1) the defendant violated a statutory or constitutional right and (2) that right was 'clearly established' at the time of the challenged conduct." *Crall v. Wilson*, 769 F. App'x 573, 575 (10th Cir. 2019) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may address the prongs of this analysis in either order; if the plaintiff fails to meet her burden on either prong, the defendant prevails. *See Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir.), *cert. denied Cummings v. Bussey*, 140 S. Ct. 81 (2019).

**III.**    **The Court will grant in part the motion to dismiss Plaintiffs' claims brought under the Eighth and Fourteenth Amendments.**

Plaintiffs bring three separate claims under the Eighth and Fourteenth Amendments: Count I, related to DeVargas's medical needs and the jail's unsanitary conditions; Count II, concerning the decision to shackle DeVargas while she was hospitalized; and Count III, regarding the forced administration of Narcan. The Court begins with Count III.

      **A.**    **The Court dismisses Count III.**

Plaintiffs allege that in forcing DeVargas to take Narcan, Defendants violated her right to be free from excessive force. (FAC ¶ 123; Doc. 21 at 30.) This claim rests on supervisory and municipal liability theories, as the named defendants did not administer the Narcan themselves.

(*See id.* ¶¶ 44–47, 123.) DeVargas "was a pretrial detainee, so the Fourteenth Amendment's Due Process Clause governs [her] claim of excessive force." *Rowell v. Bd. of Cty. Comm'rs of Muskogee Cty., Okla.*, 978 F.3d 1165, 1171 (10th Cir. 2020) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Est. of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014)).

> **1.     Plaintiffs fail to state a supervisory liability claim against Sedillo, Williams, or Olivares for the forced administration of Narcan.**

"Section 1983 does not authorize respondeat superior liability for a supervisor based solely on the actions of his subordinates." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "The three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities are: (1) personal involvement, (2) causation, and (3) state of mind." *Id.* (quotation, brackets, and citation omitted). Plaintiffs fail to establish any of the three elements.

To establish personal involvement, Plaintiffs must show that there is "an 'affirmative link' between the supervisor and the constitutional violation." *Id.* (quoting *Est. of Booker*, 745 F.3d at 435). Plaintiffs can demonstrate this link "by establishing that the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy, or the establishment or utilization of an unconstitutional policy or custom, provided the policy or custom resulted in a violation of [DeVargas's] constitutional rights." *Id.* (quotation marks and citations omitted). Defendants assert that Plaintiffs offer only threadbare allegations regarding a policy or custom of forcibly administering Narcan. (Doc. 10 at 19.)

"Pleading a . . . policy, custom, or practice is like pleading the breach element of negligence—which is also ultimately a question of fact for the jury." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). "The plaintiff cannot simply allege that

there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists." *Id.* "With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified." *Id.* Plaintiffs do not discuss a written policy regarding the administration of Narcan. (*See* FAC.) To make allegations sufficient to show an informal policy, custom, or practice,

> the plaintiff can plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible—or use other evidence, such as a police officers' statements attesting to the policy's existence.

*Griego*, 100 F. Supp. 3d at 1213. Here, Plaintiffs do not plead multiple similar instances of forced administration of Narcan; they only vaguely assert that the incident here "was done pursuant to the policy and/or custom of" the Defendants. (*See* FAC ¶ 123.) Without additional, specific supporting facts, this vague allegation of an undefined custom is insufficient to show an informal practice that will withstand a motion to dismiss.

To establish the second element (causation), Plaintiffs must "show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke*, 935 F.3d at 997 (quoting *Est. of Booker*, 745 F.3d at 435). To establish the third element (state of mind), Plaintiffs may show that Defendants acted with deliberate indifference. *Id.* "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in

13

constitutional injury of the type experienced by the plaintiff." *Id.* at 997–98 (quotation omitted). Plaintiffs point to no facts that show Sedillo or Williams set in motion a series of events that they knew would cause a violation of DeVargas's rights, or that they acted with deliberate indifference. (*See* FAC; Doc. 21 at 33–34.) Accordingly, the Court dismisses the claim as to these two defendants.

Regarding Olivares, Defendants assert that there is "no allegation that [he] directed the specific actions of the [COs] or the nurse in the manner in which they administered Narcan, only that he ordered or concurred in its use." (Doc. 10 at 20–21 (citing FAC ¶ 44).) Plaintiffs respond that "[t]he [Complaint] alleges that . . . Olivares spoke with Nurse Mares after she had spoken with Ms. DeVargas[,]" who "objected to having to take Narcan." (Doc. 21 at 34.) The Court disagrees with Plaintiffs' representation of the allegations. The Complaint does allege that Mares spoke to Olivares after she had seen DeVargas. (FAC ¶¶ 43–44.) But according to the Complaint, DeVargas did not object to Narcan until *after* Olivares ordered it, and there is no allegation that Olivares knew DeVargas objected to Narcan. (*See id.*) Thus, the Court finds Plaintiffs have not shown that Olivares "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [DeVargas] of [her] constitutional rights." (*See* Doc. 21 at 33 (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)).) In sum, Plaintiffs have made insufficient factual allegations to withstand the motion to dismiss, and the Court will grant the motion as to the claim for supervisory liability against Sedillo, Williams, and Olivares.

### 2. Plaintiffs fail to state a municipal liability claim for forced administration of Narcan.

Plaintiffs bring the claim against the County under a theory of municipal liability. "[A] municipality may be liable only if a municipal actor committed a constitutional violation." *Id.* at

998 (citation omitted). As with "supervisory liability, the plaintiff must prove '(1) official policy or custom[,] (2) causation, and (3) state of mind.'" *Id.* (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)). "The custom or practice giving rise to liability must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id.* (quotation marks and citations omitted). As with the supervisory liability claim, Plaintiffs have failed to sufficiently allege that there was a formal or informal policy or custom in place regarding the forced administration of Narcan. Thus, the Court will grant the motion with respect to the municipal liability claim as well.

> **B.     The Court dismisses Count I in part.**

Plaintiffs assert in Count I that the County was deliberately indifferent to DeVargas's medical needs by failing to implement a MAT program or maintain the jail in a sanitary condition. (*See* FAC ¶ 112(a).) Plaintiffs further allege that Olivares was deliberately indifferent by either providing DeVargas with inadequate medical treatment or by denying her treatment altogether. (*Id.* ¶¶ 112 (b)–(c).) Defendants move to dismiss this claim in full. (*See* Doc. 10 at 13–17, 20–21, 23–26.)

> **1.     Plaintiffs' claim against the County remains.**

Plaintiffs allege that the County refused to treat DeVargas's OUD, which predictably resulted in her use of illicit drugs, leading to a serious infection (due to either a dirty needle or the filthy conditions of the jail) that eventually caused her death. Defendants argue that Plaintiffs fail to assert facts that show a pattern or practice of deliberate indifference regarding jail conditions. (Doc. 27 at 13.) They also argue that the County cannot be held liable for declining to give

DeVargas the treatment of her choice or to institute a MAT program. (*See* Docs. 10 at 13–14; 27 at 25.)

The Court finds guidance in the Tenth Circuit's decision in *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022 (10th Cir. 2020). There, the plaintiffs represented the Estate of Ricardo Jose Ortiz, who was also a pretrial detainee at the Santa Fe County jail. *Id.* at 1026. Ortiz was booked into the jail on January 4, 2016, and jail staff knew he "was dependent on heroin and would likely undergo withdrawal." *Id.* at 1027. A nurse "offered Ortiz a set of medications known as a 'kick kit[,]'" but it "was never administered." *Id.* Although Ortiz experienced withdrawal symptoms, he "did not request any further treatment." *Id.* Ortiz died three days later "due to probable heroin withdrawal." *Id.* The plaintiffs moved to amend their complaint to add a claim for municipal liability based on "deficient medical intake protocol[,]" and the district court denied the motion.[7] *Id.* at 1033. The Tenth Circuit reversed, finding that the plaintiffs had plausibly alleged a *Monell* claim. *Id.* at 1034. The proposed amendment alleged: "(1) Santa Fe County maintained an unconstitutional custom of failing to treat detainees for withdrawal, which resulted in a deficient medical intake protocol, (2) that custom caused Ortiz's injury, and (3) the County's actions (or inaction) stemmed from deliberate indifference." *Id.* The plaintiffs pleaded facts to show that Ortiz did not receive or take the kick kit, which supported the allegation "that the jail had a process problem"; "that three inmates at the same jail recently experienced withdrawal-related deaths"; and facts from the 2003 DOJ study that "put Santa Fe County on notice about deficiencies in the jail's intake medical screening, assessment, and referral process." *Id.*

---

[7] The court denied the motion on the basis that the "amendment would be futile because the plaintiffs could not state a *Monell* claim without a viable claim against an individual defendant." *Quintana*, 973 F.3d at 1033. The Tenth Circuit found that this conclusion was an abuse of discretion, as "municipal liability under *Monell* may exist without individual liability[,]" as "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* (citation omitted).

(quotation marks and citation omitted). The Tenth Circuit found these facts plausibly pled a claim against the County. *See id.*

Here, Plaintiffs assert that: (1) the County maintained an unconstitutional custom of failing to adequately treat pretrial detainees for withdrawal and of failing to properly clean the jail, which (2) caused DeVargas's death, and (3) the County's refusal stemmed from deliberate indifference. Defendants argue that Plaintiffs cannot show such a custom, as jail staff treated DeVargas with Librium, just not with the treatment of her choice. (Doc. 10 at 13–14.) Plaintiffs assert that this argument misses the point: Olivares prescribed medications to treat *symptoms of withdrawal*, but he did not prescribe any medications to treat DeVargas's *disease*—OUD. (Doc. 21 at 50.) Plaintiffs' argument has merit at this stage. Plaintiffs have alleged that DeVargas suffers from OUD, a chronic disease, for which she was prescribed Suboxone. They further allege that the County, with knowledge of the efficacy of MAT programs and the detrimental effects of denying inmates access to MAT programs, refused to implement such a program, despite the high number of inmates at the jail with OUD and the history of inadequate medical care. Plaintiffs further allege Defendants knew or should have known that without a MAT program, inmates like DeVargas would suffer serious illness or death. Although Defendants cite several cases to show that MAT programs are not standard at all jails (*see, e.g.*, Doc. 27 at 25), the Court finds that Plaintiffs have alleged facts sufficient to show an unconstitutional custom regarding the jail's failure to adequately treat detainees under these circumstances.

Similarly, Plaintiffs assert facts to show that the County had notice of the jail's unsanitary conditions because of the 2003 DOJ investigation; that MRSA infections were common (resulting in one death and one serious injury to inmates housed at the jail near in time to DeVargas's death); and that drug use was rampant at the jail, as evidenced by the arrests of several jail employees.

Again, even if "recovery is very remote and unlikely," Plaintiffs have plausibly alleged a *Monell* claim, and their Complaint may proceed. *See Quintana*, 973 F.3d at 1034 (quotation omitted). The Court will deny the motion with respect to this claim.

### 2. The Court grants the motion as to any claim against Sedillo and Williams for medical needs/conditions of confinement.

Plaintiffs' Complaint is devoid of factual allegations to support a claim against Sedillo or Williams for medical needs/conditions of confinement. Moreover, Plaintiffs fail to make any argument regarding these two defendants with respect to this claim. (*See* Doc. 21.) Accordingly, the Court grants the motion and dismisses any claim against Sedillo or Williams based on DeVargas's medical needs or the unsanitary conditions of confinement.

### 3. The Court will grant the motion in part as to Olivares.

Plaintiffs assert that Olivares violated DeVargas's rights by refusing to continue her Suboxone prescription; by prescribing Narcan under these circumstances; and by failing to adequately treat her during her incarceration.[8] (Doc. 21 at 16–17, 30–40.) Again, Plaintiffs frame their allegations against Olivares as either providing inadequate medical care or by denying care altogether.

The Tenth Circuit has held that "[u]nder the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Barrie v. Grand Cty., Utah*, 119 F.3d 862, 868 (10th Cir. 1997) (quotation omitted). Thus, Plaintiffs' "inadequate medical attention

---

[8] Plaintiffs summarily assert that Olivares is responsible for the unsanitary conditions of the jail. (*See* Doc. 21 at 16.) Yet, the Complaint contains no allegations to support this claim. (*See* FAC.) And the only argument Plaintiffs make to connect Olivares with the unsanitary conditions is that he made decisions about DeVargas's condition with the knowledge "that filthy conditions at the facility increased her risk to MRSA infections and complications thereof . . . ." (*Id.* at 9.) The Court dismisses any claim against Olivares based on unsanitary conditions of the jail.

claim must be judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)." *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992) (quotation omitted). This analysis is two-pronged: an objective component that is met if the inmate can show serious medical needs, *Sparks v. Singh*, 690 F. App'x 598, 603–04 (10th Cir. 2017); and a subjective component that "requires the plaintiff to present evidence of the prison official's culpable state of mind[,]" *id.* at 604 (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

The Tenth Circuit recognizes two types of conduct by medical personnel that may constitute deliberate indifference. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir.). "First, a medical professional may fail to treat a serious medical condition properly. Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* (citing *Estelle*, 429 U.S. at 105–06). Second, an official may be liable under a "gatekeeper" theory if the plaintiff plausibly alleges that he "prevented an inmate from receiving treatment or deny[ing] him access to medical personnel capable of evaluating the need for treatment." *Id.* (citation omitted).

### The Court grants the motion with respect to Olivares's decision not to offer Suboxone.

Plaintiffs allege that Olivares was deliberately indifferent to DeVargas's serious medical needs when he did not continue treating her with Suboxone, even though she had a prescription through her private physician. (*See, e.g.*, FAC ¶¶ 59, 112(a).) Plaintiffs acknowledge that a deliberate indifference claim may only "arise when a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency . . . and the prison official, knowing that the medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell." (Doc. 21 at 16

(quoting *Kellum v. Mares*, 657 F. App'x 763, 768 (10th Cir. 2016) (internal quotation marks omitted)).)

Again, the Court finds guidance in *Quintana*. There, at intake, "Ortiz informed [the defendant nurse] that he would suffer withdrawal from his heroin addiction." 973 F.3d at 1032. But the Tenth Circuit found that "the complaint never allege[d] that [the nurse] was presented with *recognizable* symptoms that might create a medical emergency. Nor does it contend that she completely denied Ortiz care" as she ordered a "kick kit." *Id.* Similarly, here, Plaintiffs do not allege that DeVargas presented with *recognizable* symptoms of any medical emergency. The complaint states that a CO saw DeVargas "straddling the toilet with her head directly over the sink[,]" and DeVargas did not respond when the CO spoke to her. (FAC ¶ 43.) When Nurse Mares arrived, however, DeVargas told her "that she did not feel well, she had stomach pain, and [she] had done 'a bad batch of drugs.'" (*Id.* ¶ 44.) The Complaint does *not* allege that any employee saw recognizable symptoms presenting an emergency[9] or that Olivares completely denied DeVargas care. *See Quintana*, 973 F.3d at 1032 (the "need for medical treatment is 'obvious' when 'medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency'") (quotation omitted). When Mares told Olivares about DeVargas's condition, "Olivares . . . ordered or concurred that Narcan be administered . . . ." (FAC ¶ 44.) Thus, Olivares did offer treatment, just not the treatment Plaintiffs allege was appropriate. As in *Quintana*, the Court finds that the Complaint fails to show that Olivares was presented with recognizable symptoms of a medical emergency or completely denied DeVargas medical care. Because Plaintiffs fail to show a constitutional violation based on Olivares's decision not to

---

[9] For example, Plaintiffs emphasize that DeVargas was conscious, breathing, responsive, and talking, and "[t]here are no allegations that her skin was discolored, clammy or cold." (*See* FAC ¶ 44; *see also* Doc. 21 at 31.)

continue DeVargas's Suboxone prescription, Olivares is entitled to qualified immunity on this issue. *See Cummings*, 913 F.3d at 1239.

**The Court grants the motion with respect to Olivares's decision to administer Narcan.**

Plaintiffs assert a claim against Olivares for deliberate indifference to DeVargas's medical needs for his decision to order Narcan. (*See* FAC ¶¶ 112(a), 123.) Defendants first contend that Plaintiffs fail to plead facts sufficient to allege the objective prong—that "[t]here was no substantial risk of serious harm to Ms. DeVargas from administering Narcan." (Doc. 27 at 19.) Yet Plaintiffs allege that Narcan "has many dangerous potential side effects[,]" including tachycardia brain disease, and coma. (FAC ¶ 49.) Reading the Complaint in a light most favorable to Plaintiffs, the Court finds that they have met the objective prong.

Regarding the subjective prong, Defendants argue that Plaintiffs fail to plausibly allege that Olivares "knew about and disregarded a substantial risk of harm to [DeVargas's] health or safety" in administering the Narcan. *See Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). (*See also* Doc. 27 at 19.) Plaintiffs contend that the risks of administering Narcan to a conscious, responsive individual were obvious. (*See* Doc. 21 at 36–37.) Again, considering only the allegations in the Complaint, this claim might squeak by, regardless of whether the Court believes it would survive summary judgment.

Plaintiffs have not, however, pointed to any clearly established law that would put Olivares on notice that directing medical staff to administer Narcan to a conscious individual with symptoms like DeVargas's would violate her constitutional rights. Plaintiffs argue that "there are circumstances where a plaintiff need not point to prior similar cases to defeat qualified immunity[,]" and "[t]he forced application of Narcan under the circumstances alleged in the [Complaint] is so outrageous that" it would be impossible to find a case on point. (Doc. 21 at 39.)

The Court is unpersuaded for at least two reasons. First, as the Court found above, the Complaint does not allege that Mares told Olivares that DeVargas did not want Narcan, so there is no allegation that Olivares directed jail staff to forcibly restrain DeVargas to administer the Narcan. Second, the Court declines to find that Olivares's medical decision to administer Narcan to a conscious person, while possibly indicative of medical negligence, is sufficiently harmful to evidence deliberate indifference. Olivares was faced with a choice between allowing DeVargas to suffer from a drug overdose, given her symptoms and her statement that she had done "a bad batch of drugs," or to treat the possible overdose. Under the circumstances alleged in the Complaint, the Court finds that Olivares's conduct did not so obviously violate a constitutional or statutory right "that it is not necessary for [Plaintiffs] to show clearly established existing law prohibiting such conduct." *See Est. of Ceballos v. Husk*, 919 F.3d 1204, 1218 (10th Cir. 2019). Olivares is entitled to qualified immunity on this issue.

### The Court grants in part the motion with respect to Olivares's later treatment of DeVargas.

Finally, Plaintiffs assert that Olivares violated DeVargas's rights by failing to provide adequate medical treatment while she was incarcerated, and by failing to obtain specialized care for her that he could not provide. (*See* FAC ¶ 112(b); Doc. 21 at 5.) Plaintiffs discuss three dates on which they allege Olivares was deliberately indifferent to DeVargas's serious medical needs: October 4, 18, and 20.

### October 4

The Complaint alleges that following the forced administration of Narcan on September 19, 2019, DeVargas complained of stomach pains and small seizures on October 1, for which she requested medical attention. (*Id.* ¶¶ 42, 47, 60.) The facility's medical records show that DeVargas

was not examined or given treatment for her complaints.[10] (*Id.* ¶ 60.) "Rather, Defendants assumed that [she] was going through withdrawal." (*Id.*) DeVargas went to the medical unit on October 4 with a fever, abdominal and flank pain, and nasal congestion. (*Id.* ¶¶ 61–62.) Olivares was not present when DeVargas went to the medical unit at 7:30 p.m. on October 4. (*See id.* ¶ 63.) Instead, a nurse saw DeVargas, gave her a Urinary Tract Infection test (which was negative), and called Olivares to explain DeVargas's condition. (*Id.*) Olivares prescribed an antibiotic but "did not order blood work" or other testing to see if DeVargas was suffering from an infection. (*Id.*) Plaintiffs argue that because Olivares knew DeVargas was an IV drug user with access to illicit drugs in an unsanitary facility and was at "high risk of developing endocarditis or other serious condition from any infection she contracted," he was deliberately indifferent to her serious medical needs by not personally examining her or directing staff to run further tests. (*See id.* ¶¶ 64, 112(b).)

Defendants argue that Olivares directed treatment based on DeVargas's symptoms; thus, Plaintiffs may not plausibly support a claim of deliberate indifference based on allegations that the treatment Olivares chose was wrong. (*See* Doc. 10 at 24–25.) The law is in Defendants' corner. First, Defendants contend that "[t]here is no case law within this Circuit that clearly establishes liability under Section 1983 upon a physician who does not personally evaluate an inmate at 7:30 p.m. . . ." (*Id.* at 25.) Plaintiffs do not respond to this argument or cite clearly established law to put Olivares on notice that he would violate DeVargas's constitutional rights by allowing the on-duty nurse to evaluate DeVargas and then directing DeVargas's care by phone on a Friday evening when he was not present at the jail. (*See* Doc. 21.)

---

[10] Plaintiffs do not specify that Olivares was responsible for any failure to examine DeVargas on October 1. (*See* FAC ¶¶ 60, 112(b).)

Next, Defendants argue that Plaintiffs fail to plausibly plead the subjective prong where the provider "prescribed treatment for the symptoms presented," even though those "symptoms could have *also* pointed to other, more serious conditions . . . ." (Doc. 10 at 24 (quoting *Spencer v. Abbott*, 731 F. App'x 731, 745 (10th Cir. 2017)).) Knowing DeVargas's symptoms and that she had a negative Urinary Tract Infection test, Olivares prescribed an antibiotic, and she was kept overnight for observation. (*See* FAC ¶ 63.) While Plaintiffs argue that Olivares should have performed additional tests to discover the origin of any potential infection, the Court finds that under the facts alleged, Olivares "exercise[d] his considered medical judgment." *Self*, 439 F.3d at 1232. "Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Id.* (citation omitted). Plaintiffs do not allege facts that would establish Olivares "fail[ed] to treat a medical condition . . . so obvious" on October 4 "that even a layman would recognize the condition . . . ." *See id.* (citing *Mata*, 427 F.3d at 755–59). Consequently, any claim based on Olivares's conduct on October 4 fails.

### October 18

DeVargas's "condition appeared to improve" on antibiotics. (FAC ¶ 67.) There is no allegation that DeVargas sought or obtained additional medical treatment until October 17, 2019, when she woke up with a fever. (*Id.* ¶ 68.) DeVargas went to the medical unit at 2:15 a.m. on October 18. (*Id.*) Nursing notes show that she "was crying from pain on arrival" and "complained of back pain, sharp chest pain below her left breast, and shortness of breath." (*Id.* ¶ 69.) Nursing staff gave DeVargas ibuprofen and Tylenol and sent her back to her cell. (*Id.*) Plaintiffs assert that Olivares did not examine DeVargas, but there is no allegation that Olivares was on duty at 2:15 a.m. or that nursing staff even contacted him. (*See id.*)

Jail staff initiated a Code Blue for DeVargas around 12:15 p.m. on Friday, October 18, 2019. (*Id.* ¶ 70.) Olivares responded and found DeVargas sitting on a chair, her chest pain "so severe that she could not stand." (*Id.* ¶ 71.) DeVargas told him that she had back pain that radiated to her left breast when she breathed and that prevented her from lying down or breathing deeply. (*Id.* ¶¶ 71–72.) DeVargas also informed Olivares that she was using illicitly-obtained Suboxone intravenously. (*Id.* ¶ 72.) Olivares examined her in the medical unit at 12:35 p.m. and described her pain as "pleuritic in nature." (*Id.* ¶¶ 71–72.) He ordered an x-ray to be performed on October 22 "to see if she had a broken rib or pneumonia" then released DeVargas back to her cell that afternoon. (*Id.* ¶¶ 73–74.)

Plaintiffs contend that Olivares was deliberately indifferent to a serious medical condition when he failed to order any testing to determine if DeVargas had a MRSA infection. (Doc. 21 at 6–7.) They argue that this is not simply a case of medical negligence, because all of the information available to Olivares pointed to a serious infection: that the jail had a high rate of MRSA infections; DeVargas had OUD; was in withdrawal; had intravenously injected illicitly-obtained Suboxone; had a fever, back and chest pain, and trouble breathing; and had complained of abdominal/flank pain two weeks earlier. (*Id.* at 9.) Defendants point out that "Olivares determined that DeVargas'[s] symptoms were consistent with pleurisy, not an infection." (*See* Doc. 27 at 6 (citing FAC ¶¶ 72, 77).) Olivares examined DeVargas, directed her to stay in the medical unit for observation, and ordered an x-ray to be taken on October 22. (FAC ¶¶ 73–74.)

There is, however, no allegation that he ordered any treatment for the suspected pleurisy. (*See id.*) The Tenth Circuit has confirmed that where "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, *e.g.*, a patient complains of chest pains and the prison official, knowing that medical

protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell." *Self*, 439 F.3d at 1232 (citing *Mata*, 427 F.3d at 755–59; *Sealock*, 218 F.3d at 1211–12). In *Kellum*, for instance, a nurse saw that an inmate "was exhibiting severe, obvious, recognizable symptoms—prolonged high fever and chills, demonstrable breathing problems, nausea, low blood pressure, poor skin color, and inability to stand or walk—which [the nurse] must have known required urgent medical attention and indicated a need for an ECG and other diagnostic testing to assess the reason for these symptoms." 657 F. App'x at 770. And in *Al-Turki v. Robinson*, the Tenth Circuit found that "several hours of untreated severe pain" would "fall on the actionable side of the line." 762 F.3d 1188, 1194 (10th Cir. 2014). Here, Olivares did not treat DeVargas at all after a Code Blue was called due to her fever, difficulty breathing, and back and chest pain that made it difficult to lie down or stand up. Instead, after a short hold for observation, he sent her back to her cell where her condition deteriorated until she returned to the medical unit on October 19. The Court finds that Plaintiffs have alleged facts sufficient to show deliberate indifference, and clearly established law put Olivares on notice that he was obligated to do *something* to treat DeVargas's symptoms under these circumstances. The Court will deny the motion to dismiss with respect to the allegations of inadequate medical care on October 18.

### October 20

Plaintiffs allege that although Olivares ordered DeVargas be taken to the hospital around 12:15 a.m. on October 20, staff notes reveal they did not leave for over an hour. (*Id.* ¶ 76.) To the extent Plaintiffs argue that Olivares evidenced deliberate indifference by the one-hour delay before transfer, the Court finds the motion to dismiss should be granted. The Complaint does not allege *who* caused the delay, nor that DeVargas was substantially harmed by the one-hour delay. *See,*

*e.g.*, *Kellum*, 657 F. App'x at 770–71 (prison official delayed "treatment for five hours, causing substantial harm").

**The Court grants the motion with respect to any claim that Olivares is liable in his role as a "gatekeeper."**

Plaintiffs also seek to hold Olivares liable under a gatekeeper theory. (*See* Doc. 21 at 10.) "Ordinarily, a medical professional will not be liable for this . . . kind of deliberate indifference, because he is the person who provides the treatment." *Sealock*, 218 F.3d at 1211. "If, however, the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care." *Id.*

Plaintiffs point to no allegations that state a claim for liability under a gatekeeper theory. On the contrary, the Complaint simply alleges the first type of deliberate indifference: failure to treat DeVargas's condition properly (i.e., failure to order blood work or to take steps to diagnose her condition). (*See* FAC ¶¶ 112(b)–(c).) Plaintiffs do not allege that Olivares was incapable of treating DeVargas's condition or denied her access to medical personnel who could treat her. Accordingly, the Court will grant the motion to dismiss with respect to any claim based on a gatekeeper theory of liability.

**C.    The Court dismisses the claim based on the decision to shackle DeVargas brought against the individual defendants.**[11]

Next, Plaintiffs allege that by shackling DeVargas while she was incapacitated, the County, Williams, Sedillo, Rojas, and Rios used excessive force on DeVargas and subjected her to

---

[11] Defendants do not develop an argument to dismiss this claim against the County, and the Court declines to manufacture an argument on their behalf. (*See* Docs. 10 at 17–18; 27 at 13–15.) Thus, this claim remains as to the County.

unconstitutional conditions of confinement. (*See id.* ¶¶ 119–22.)

### 1.      Plaintiffs fail to state a claim against Sedillo or Williams.

Plaintiffs summarily allege that the decision to shackle DeVargas "was done pursuant to the policy and/or custom of [the] County and was approved by Defendants Sedillo and Williams." (FAC ¶ 122.) But this allegation is too vague to plausibly state a claim against Sedillo or Williams. The facts establish that Rios and Rojas required DeVargas's continued restraint, despite knowing that she was paralyzed. (*See, e.g.*, FAC ¶ 90.) Further, only Rios had information from the hospital's medical director about the risk of restraints on DeVargas's health. (*Id.* ¶ 82.) As Plaintiffs do not connect Sedillo and Williams to the claim, the Court dismisses it as to them.

### 2.      Rios and Rojas are entitled to qualified immunity for Plaintiffs' claim based on excessive force.

Because DeVargas was a pretrial detainee, the Court analyzes the excessive force claim under the Fourteenth Amendment's Due Process Clause, which protects her "from the use of excessive force that amounts to punishment." *Kemmerly v. Hill*, 814 F. App'x 378, 384 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). "[A] pretrial detainee must show only that the force purposely or knowingly used against [her] was objectively unreasonable." *Id.* (quoting *Kingsley*, 576 U.S. at 396–97).

The *Kingsley* Court explained that "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court examines the facts "from the perspective of a reasonable officer on the scene" *id.* (citing *Graham*, 490 U.S. at 396), and "account[s] for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials

28

'are needed to preserve internal order and discipline and to maintain institutional security'" *id.* (quoting *Bell*, 441 U.S. at 540, 547). Courts consider the following factors in analyzing reasonableness:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).

Defendants argue that they "were simply following their security policy" in restraining DeVargas. (Doc. 10 at 18.) "Rojas [and] Rios had a legitimate interest in keeping Ms. DeVargas restrained while she was in the hospital: to ensure the safety of others at the hospital and to prevent flight." (*Id.*) As Plaintiffs note, however, the use of force employed—shackling DeVargas's arms and legs to the bed—was greater than necessary in light of the fact that she was incapacitated. DeVargas posed no security issue or threat, and Defendants have not shown that shackling her was a realistic solution "to preserve internal order and discipline [or] to maintain institutional security." *See Kingsley*, 576 U.S. at 397. Yet, even if the Court finds that Plaintiffs have sufficiently stated a claim for excessive force, they fail to cite clearly established law that would have put Defendants on notice that their conduct violated DeVargas's rights. Plaintiffs argue that this violation was so obvious, they "need not point to prior similar cases to defeat a qualified immunity defense . . . ." (Doc. 21 at 28.)

"Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal quotation marks omitted). "The dispositive question is 'whether

the violative nature of the particular conduct is clearly established.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). For example, in *Smith v. City and County of Denver*, the court found that the defendant officers who tased an unconscious suspect were not entitled to qualified immunity, even though there was no factually similar case to put them on notice. Civ. No. 07-cv-00154-WDM-BNB, 2008 WL 724629, at *7 (D. Colo. Mar. 18, 2008).

But here, while the decision to keep DeVargas handcuffed to the bed was unwarranted, there is no indication that it was particularly reckless or cruel. The guards were directed to remove and readjust the restraints every two hours for DeVargas's well-being and comfort. Under these circumstances, the Court does not find Defendants' conduct so egregious that they are not entitled to qualified immunity.

### 3. Defendants are entitled to qualified immunity for the conditions of confinement claim.

"Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, . . . the Eighth Amendment standard provides the benchmark for such claims." *Abila v. Funk*, 220 F. Supp. 3d 1121, 1179 (D.N.M. 2016) (quoting *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998)) (subsequent citations omitted). "In the context of pretrial detainees, then, 'the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement.'" *Id.* (quoting *Craig*, 164 F.3d at 495). The Tenth Circuit has held that conditions to which pretrial detainees are subjected "may be restrictive and even harsh without violating constitutional rights." *Craig*, 164 F.3d at 495 (quotation marks and citation omitted). "[O]nly those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quotation omitted). Courts consider both the "severity of the alleged deprivations" and "their duration." *Id.* (citation omitted).

Plaintiffs must show "that the deprivation is sufficiently serious, and . . . that the prison officials' deliberate indifference caused the deprivation." *Abila*, 220 F. Supp. 3d at 1179–80 (citing *Craig*, 164 F.3d at 495). To show deliberate indifference, Plaintiffs must plead facts to show that the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 1180 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Absent allegations of 'deliberate indifference' by prison officials and of a 'specific deprivation' of a 'human need,' an Eighth Amendment claim based on prison conditions must fail." *Shifrin v. Fields*, 39 F.3d 1112, 1114–15 (10th Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 303–05 (1991)).

Defendants argue that Plaintiffs fail to show an excessive risk posed to DeVargas by shackling her to the hospital bed. (Doc. 27 at 15.) The Complaint alleges, however, that "[b]ecause of her medical condition the use of mechanical restraints presented a substantial risk for causing a skin infection or otherwise worsening her condition." (FAC ¶ 82.) The Complaint further alleges that the hospital's medical director told the COs guarding DeVargas that he wanted to speak to Rojas or "Rios about removing the mechanical restraints because of the risk to Ms. DeVargas's health." (*Id.*) "Rios was contacted and refused to have the restraints removed, stating that [the] County would only agree to remove the restraints every two hours and adjust them . . . ." (*Id.*) Thus, Plaintiffs plausibly allege that Rios—but not Rojas—knew of and disregarded an excessive risk to DeVargas's health. The Court will grant the motion to dismiss this claim against Rojas.

Defendants argue that even if Plaintiffs have plausibly stated a claim for unconstitutional conditions of confinement, Plaintiffs have not cited clearly established law on this issue. The Court agrees. Yet again, Plaintiffs do not cite to any case with similar facts, but instead argue that the

state of the law in 2019 "provided sufficient notice [to Defendants] that the 'obvious cruelty' in the conduct at issue . . . violated [DeVargas's] constitutional" rights. (Doc. 21 at 28–29 (quoting *Hope v. Peltzer*, 536 U.S. 730, 745 (2002)).) Plaintiffs discuss *Hope*, where the Supreme Court found officers were not entitled to qualified immunity for handcuffing an inmate to a "hitching post" as punishment for misconduct, even though there was no factually similar case to put the officers on notice. (*See id.* (citing *Hope*, 536 U.S. at 741).)

In *Hope*, an inmate remained handcuffed to a hitching post for seven hours, shirtless in the sun. 536 U.S. at 734. He received "water only once or twice and was given no bathroom breaks." *Id.* at 735. "[A] guard taunted Hope about this thirst." *Id.* Hope suffered physical discomfort, including decreased circulation and pain in his wrists. *Id.* at 734. In finding the guards were not entitled to qualified immunity, the Court paid particular attention to the "substantial risk of physical harm" due to "the restricted position of confinement" and the "unnecessary exposure to the heat of the sun" without water. *Id.* at 738. It also noted the guard's taunting and the "deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." *Id.* The Court found that the "punitive treatment amount[ed] to gratuitous infliction of 'wanton and unnecessary' pain that our precedent clearly prohibits." *Id.*

While Rios knew that there was a risk of skin infection, he took care to direct the guards to remove and readjust the restraints every two hours. Moreover, the deprivation Plaintiffs allege was to DeVargas's dignity—*i.e.*, restraining her while incapacitated. The Court agrees that the restraints imposed seem uncalled-for under the circumstances, but there are no allegations that Rios (or any official) acted in a cruel or punitive manner. Where the Tenth Circuit has affirmed that pretrial detainees may be subjected to "restrictive and even harsh" conditions "without violating constitutional rights[,]" the Court finds that this situation is not "sufficiently grave" to

put the individual defendants on notice that their conduct violated DeVargas's constitutional rights. *See Craig*, 164 F.3d at 495 (quotation marks and citations omitted). The Court finds that Rios (and all individual defendants) are entitled to qualified immunity for this claim.

**IV.     Plaintiffs fail to state a claim under the ADA or Section 504.**

Plaintiffs allege that the County's failure to provide a MAT program violated the ADA and Section 504 of the Rehabilitation Act. (*See* FAC ¶¶ 113–18.) To state a claim under either Title II of the ADA or Section 504 of the Rehabilitation Act, Plaintiffs "must allege that (1) [DeVargas was] a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citing 42 U.S.C. § 12132) (subsequent citation omitted); *see also Swenson v. Lincoln Cty. Sch. Dist. No. 2*, 260 F. Supp. 2d 1136, 1145 (D. Wyo. 2003) (noting that "[t]he elements of a cause of action under Title II of the ADA and section 504 of the Rehabilitation Act are the same because Congress has directed courts to construe the ADA as giving at least the same amount of protection as the Rehabilitation Act") (citations omitted).

Plaintiffs compare their claim to that in *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018). In *Pesce*, the plaintiff (Pesce) had "been in active recovery from opioid addiction for two years with the help of a methadone treatment program prescribed by his doctor." 355 F. Supp. 3d at 38–39. Pesce violated his probation, and he knew that the facility in which he would be incarcerated did not provide a MAT program. *Id.* at 41. Anticipating the forced withdrawal and harm to his long-term recovery efforts, Pesce sought "injunctive relief requiring that [the jail] provide him with access to methadone treatment . . . ." *Id.* at 43. He also alleged that the jail's refusal to treat inmates with "methadone (as prescribed) deprives him of the benefit of health care

programs, and that such conduct constitutes discrimination on the basis of his disability" under the ADA. *Id.* at 45.

The court found that "the medical care provided" by the jail "qualifies as a 'service' that disabled inmates must receive indiscriminately under the ADA." *Id.* (citing *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)). The court noted evidence showing that Pesce had a long history of successful treatment with the MAT program, while the method the jail used to treat addicts had been proven in the past as ineffective at helping Pesce. *See id.* at 46–47. Because the jail had "not given any consideration to Pesce's specific medical needs[,]" the court disagreed with the jail's framing of the issue as simply "a disagreement with reasoned medical judgment[,]" which would be insufficient to state a disability discrimination claim. *Id.* at 46. Instead, because the jail failed to show specific safety or security reasons to prohibit methadone treatment, the court found that Pesce was likely to succeed on the merits of his ADA claim. *Id.* at 47.

Defendants contend that *Pesce* is distinguishable because there, the plaintiff had shown long-term, effective treatment with Suboxone and evidence that the jail's method of treatment would increase his risk of relapse and overdose. (Doc. 27 at 24.) Here, Plaintiffs do not allege that DeVargas had such a history or "that she was even appropriately taking Suboxone pursuant to a valid prescription." (*Id.*) Defendants' argument identifies a necessary element of an ADA/504 claim that Plaintiffs' Complaint lacks: notice. "Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation." *Robertson*, 500 F.3d at 1196. Here, unlike in *Pesce*, there is no allegation that Defendants had knowledge that DeVargas had a long history of treatment with a MAT program, unsuccessful treatment on the type of medications the jail used, or ever requested treatment with Suboxone. The

Complaint alleges only that Olivares had notice that DeVargas's physician "had given her a prescription for Suboxone" less than a month before she entered the jail. (FAC ¶ 59.)

Plaintiffs further argue that "treating the symptoms of cancer with pain medication is [not] the same as treating the disease with radiation or chemotherapy, and Defendants cite no case holding that treating the symptoms of opiate withdrawal constitutes treatment for the disease of OUD." (Doc. 21 at 50.) Plaintiffs cite *Smith v. Aroostook County*, a case in which the plaintiff, like that in *Pesce*, sought injunctive relief to require a jail to continue her Suboxone treatment. 376 F. Supp. 3d 146, 153–54 (D. Maine 2019). There, the jail knew that the plaintiff had been diagnosed with OUD and had been treated with Suboxone as part of a MAT program for approximately ten years. *See id.* at 149. The jail maintained that the plaintiff would receive treatment in the form of medications to assist her during the withdrawal process. *Id.* at 152. The court, finding that the jail's "withdrawal protocol is not a treatment for opioid use disorder[,]" granted injunctive relief. *Id.* at 152, 162. But unlike in *Smith* and *Pesce*, Plaintiffs have not alleged facts to show that the jail had any information that DeVargas had an OUD diagnosis. Nor have they shown that DeVargas's need for Suboxone was so obvious that the jail had notice she needed that specific medication. *See Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.") (citation omitted); *see also Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1269 n.10 (10th Cir. 2018) (applying notice requirement to a § 504 claim). Thus, Plaintiffs fail to show that the jail's decision not to treat DeVargas with Suboxone was so "arbitrary or capricious[] as to imply that it was pretext for some discriminatory motive" or "discriminatory on its face." *See Pesce*, 355 F. Supp. 3d at 47 (quoting *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006)). The Court will grant Defendants' motion regarding Plaintiffs' claim under the ADA and Section 504.

**V.     The Court will grant in part the motion to dismiss Plaintiffs' claims brought under the NMTCA.**

Defendants move to dismiss Plaintiffs' claim under N.M. Stat. Ann. § 41-4-6 (including the claim for negligent supervision, hiring, and training), any claim brought to enforce rights guaranteed by the New Mexico Constitution, and the battery claim against Olivares. (*See* Doc. 10 at 28–31.) Plaintiffs clarify that they did not intend to bring a battery claim against Olivares, but against the County on the basis of the COs' conduct in forcefully administering Narcan. (Doc. 21 at 40.)

The NMTCA "shields 'governmental entities and public employees from tort liability unless immunity is specifically waived by' the" NMTCA. *Trujillo v. Salazar*, No. CIV-04-0689 JB/WDS, 2006 WL 1228827, at *5 (D.N.M. Mar. 1, 2006) (quoting *Archibeque v. Moya*, 866 P.2d 344, 346 (N.M. 1993)). "A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions listed in the NMTCA." *Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, 1193 (D.N.M. 2013) (citing *Begay v. New Mexico*, 723 P.2d 252, 256 (N.M. Ct. App. 1985) ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), *rev'd on other grounds by Smialek v. Begay*, 721 P.2d 1306 (N.M. 1986)).

**A.     The Court will grant in part the motion to dismiss Plaintiffs' claim brought under § 41-4-6.**

Section 41-4-6(A) waives immunity "for damages resulting from bodily injury . . . caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). It appears that Plaintiffs base this claim on their allegations that the County failed to maintain the jail in a safe and sanitary condition and failed to adequately treat inmates'

medical needs with a MAT program. (*See* FAC ¶¶ 130–36.) Defendants argue this claim fails for two reasons: first, because it is premised on allegations of negligent supervision, hiring, training, retention, and discipline, which are not actionable under the NMTCA; and second, because the allegations indicate that any negligent behavior affected DeVargas alone, rather than a class of users at the jail. (*See* Docs. 10 at 28–30; 27 at 28–30.)

The Court agrees that the Complaint does not plausibly allege any claim for negligent hiring, retention, or discipline. The few related allegations are vague and conclusory. (*See* FAC ¶ 5 (the County is responsible for hiring, disciplining, etc. jail employees and officials, including the individual defendants), ¶ 16 (the County has engaged in "improper political considerations in hiring and firing decisions"), ¶ 105 (Defendants breached their duties to DeVargas by "improperly hiring and/or supervising Defendant Olivares"), ¶ 142 (the County breached its duty by negligently hiring Olivares).) Additionally, Plaintiffs largely ignore any discussion of negligent hiring, retention, or discipline in their response brief. (*See* Doc. 21.)

Plaintiffs more plausibly develop the negligent supervision and training allegations. (*See* FAC ¶ 105 (the County and its supervisory employees "fail[ed] to properly train the medical staff . . . in how to diagnose and treat inmates known to have [OUD] or who presented with infections").) "[W]hile a claim premised solely on negligent supervision does not fall within the waiver, Section 41-4-6 does waive immunity for a failure of supervision where it is 'tied directly to the operation of [a] building.'" *Armijo v. Bd. of Cty. Comm'rs of the Cty. of Socorro*, No. CV 20-355 GBW/SMV, 2021 WL 1176317, at *7 (D.N.M. Mar. 28, 2021) (quoting *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1264 (N.M. 2006)). Plaintiffs explain that they are not simply claiming that the jail staff's negligent supervision caused harm, but that the County failed to maintain the jail in a safe and sanitary condition, to implement a MAT program, and to supervise and train staff who

can diagnose and treat inmates with OUD, thereby creating a dangerous condition for all inmates and detainees who suffer from OUD. (Doc. 21 at 17–18; *see also* FAC ¶ 105, 130–36.)

Defendants argue that Plaintiffs cannot show a dangerous condition for a group of people at the jail, as the other instances of injuries and death due to allegedly inadequate medical care occurred "many years prior" and "are too remote in time and dissimilar to" the facts relevant to DeVargas's death. (Doc. 27 at 30.) Defendants cite several cases (*see* Doc. 10 at 28–30), including *Lessen v. City of Albuquerque*, 187 P.3d 179 (N.M. Ct. App. 2008). In *Lessen*, a recently booked inmate who exhibited physical withdrawal symptoms and "bizarre behavior" was released a day after intake. *Id.* at 180–81. Jail staff did not ensure that he complied with certain release procedures, allowing him to wander off in the jail's parking lot rather than take provided transportation. *See id.* The inmate died of hypothermia. *Id.* at 181. The inmate's wrongful death estate argued that the city negligently failed "to ensure proper transportation for all released inmates and [failed] to attend to inmates' medical needs" in violation of § 41-4-6. *Id.* at 184. The appellate court disagreed, finding that the plaintiff did "not identify the danger to which MDC employees' act or omissions exposed released inmates." *Id.*

Here, though, Plaintiffs allege that the County's failure to implement a MAT program causes inmates and detainees who suffer from OUD to experience more severe withdrawal symptoms and an increased risk of relapse or death.[12] (*See* FAC ¶ 28.) They also allege that a

---

[12] Plaintiffs' claim reads much like that in *Gallegos v. Bernalillo County Board of Commissioners*, where an inmate (Gallegos) who suffered from OUD alleged that the facility was negligent for not offering a methadone treatment program. No. CV 16-0127 JB/WPL, 2017 WL 3575883, at *42 (D.N.M. Aug. 17, 2017). The court found that "[t]o benefit from § 41-4-6(A)'s waiver, Gallegos must show a 'general failure to implement promised safety polices,' or some other 'dangerous condition affecting the general public.'" *Id.* (quoting *Upton*, 141 P.3d at 1263). The inmate alleged that the county was liable for failing to implement a policy requiring methadone for inmates with OUD. *See id.* On summary judgment, the court found the claim failed (in relevant part), though, because the evidence showed that the jail had a safety policy for opiate-addicted inmates and was treating the inmate. *See id.* The inmate's argument that the only "proper procedure" was to treat him with methadone was insufficient to state a claim under § 41-4-6. *Id.* at *43. There was no evidence "that the [facility's] general policy for treating opiate withdrawal is abjectly unsafe

"majority of inmates in county jails" suffer from OUD, that illicit drug use is a known and common problem at this jail, and inmates who illicitly use drugs at the jail are also at risk of infection and illness due to the jail's unsanitary conditions. (*Id.* ¶¶ 30, 33, 102.) Plaintiffs' claim is more like that in *Armijo*, in which detention center staff received repeated warnings from multiple people that an inmate (Armijo) was suicidal. *See* 2021 WL 1176317, at *1. Staff did not respond to these warnings, and Armijo committed suicide. *Id.* The inmate's wrongful death estate brought a claim under § 41-4-6. The court found that the claim fell within the NMTCA's waiver on the theory that the detention center was "dangerous to prisoners with suicidal ideations if it fails to implement reasonable procedures to identify such prisoners and supervise them once identified." *Id.* at *8. Because the complaint included allegations regarding the prevalence of suicide risk at jails "and the existence of relevant [jail] policies for mitigation of that risk," the plaintiff had plausibly pled that the defendants knew or should have known about the danger. *Id.*

Similarly, in this case, Plaintiffs allege that Defendants were aware that "[a] substantial percentage of the inmates at [the jail], perhaps the majority of inmates, suffered from [OUD]." (FAC ¶ 100.) Defendants had been urged by national associations and a local county commission to implement a MAT program, as inmates treated with the MAT program were less likely to recidivate and experience "the painful, sometimes fatal, process of withdrawal." (*Id.* ¶¶ 27–38.) Defendants knew or should have known, therefore, the danger to inmates with OUD if the jail continued to treat their withdrawal symptoms with medications that were far less effective. Thus, the Court will grant the motion with respect to any claim for negligent hiring, retention, or discipline, and otherwise deny the motion.

---

because . . . it does not include a methadone dosage." *Id.* The Court need not reach this issue, as Defendants did not make such an argument here.

**B.      The Court will grant the motion with respect to any claim brought under the New Mexico Constitution.**

Plaintiffs bring a claim against the County, Williams, and Sedillo for unlawful seizure, excessive force, and battery under Article II, Sections 10, 13, and 18 of the New Mexico Constitution. (*Id.* ¶¶ 138, 140–41.) Defendants contend that the NMTCA does not waive claims generally brought "to enforce rights guaranteed by the New Mexico Constitution" and moves to dismiss this claim. (Doc. 10 at 29.) Plaintiffs respond that a waiver for these claims is found in § 41-4-12, as William and Sedillo, acting as warden and director of the jail, are "law enforcement officers within the meaning of § 41-4-12." (Doc. 21 at 20 (citation omitted).)

The plaintiff in *Caillouette v. Hercules, Inc.*, 827 P.2d 1306 (N.M. Ct. App. 1992), made a similar argument. She alleged that a law enforcement officer deprived her of a state statutory right under § 41-4-12, which waives "immunity for injuries resulting from the 'deprivation of any rights . . . secured by the constitution and laws of . . . New Mexico . . . .'" *Id.* at 1310 (quoting N.M. Stat. Ann. § 41-4-12). The state court found that § 41-4-12 did not waive immunity for a violation of the state statute. *See id.* at 1311. "If we were to base a waiver of immunity on these provisions, the exceptions thus created would eliminate the principle of sovereign immunity." *Id.*; *see also Blea v. City of Espanola*, 870 P.2d 755, 760 (N.M. Ct. App. 1994) (finding that § 41-4-12 did not waive immunity for a claim brought under Article II, Section 4 of the state constitution and noting that waivers under § 41-4-12 "should not swallow the rule of immunity or make the enumeration of acts in [the section] superfluous").

Plaintiffs do not cite binding authority to establish that § 41-4-12 waives immunity for violations of Article II, Sections 10, 13, or 18. Cases within this district have gone both ways in analyzing similar claims. *See Price v. Whitten*, No. CIV 20-1099 RB/KRS, 2021 WL 3663851, at

*10 (D.N.M. Aug. 18, 2021) (citing *Smith v. City of Hobbs*, No. 19CV00796 JCH/SMV, 2021 WL 1614644, at *3 (D.N.M. Apr. 26, 2021) (noting that the court in *Schingel* "presumed that New Mexico waives immunity for a cause of action brought under Article II, Section 10") (citations omitted); *Lewis v. Sandoval*, No. CV 09-0136 KBM/WDS, 2009 WL 10675509, at *2 (D.N.M. Oct. 31, 2009) (declining to allow amended complaint that included a claim under § 41-4-12 for violation of rights under Article II, Section 10); *Reynolds v. Bd. of Comm'rs of the Cty. of Lincoln, N.M.*, No. CIV 00-168 LFG/RLP, 2000 WL 36739562, at *2 (D.N.M. Sept. 15, 2000) ("An amendment to include a claim for violation of Reynolds' state constitutional rights by law enforcement officers would be futile, because it does not appear that New Mexico courts allow such claims.")). In the absence of such authority, the Court declines to allow Plaintiffs' claim to go forward and grants the motion to dismiss any claim brought under Article II, Sections 10, 13, or 18.

## VI.     Conclusion

To summarize, the Court dismisses Count I in part (any claim against Sedillo, Williams, or Olivares for conditions of confinement or the MAT program; any claim against Olivares regarding the administration of Narcan, the failure to continue the Suboxone prescription, conditions of the jail, the denial of medical care on October 4 or 20, 2019, or based on a "gatekeeper" theory); Count II in part (the claim for shackling against the individual defendants); Count III (forced administration of Narcan); Count IV (ADA/504); and Count V (any claim for negligent hiring, retaining, or disciplining under § 41-4-6 and any claim under the New Mexico Constitution).

Plaintiffs' remaining claims include:

<u>Count I</u>: Under the Eighth and/or Fourteenth Amendments for deliberate indifference against the County (by failing to implement a MAT program, by refusing to treat DeVargas's OUD

41

with Suboxone or a similar medication, and/or by allowing the jail to remain in an unsanitary condition) and Olivares (by failing to treat DeVargas on October 18). (*Id.* ¶ 112.)

Count II: Under the Eighth and Fourteenth Amendments for the County's policy or custom regarding shackling. (*Id.* ¶¶ 119–22.)

Count V: Remaining state tort claims under N.M. Stat. Ann. §§ 41-4-6, 41-4-9, 41-4-10, and 41-4-12 (battery against the County). (*Id.* ¶¶ 124–42.)

Count VI: A.D.'s loss of consortium claim against the County. (*Id.* ¶¶ 143–48.)

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Dismiss, in Part, for Failure to State a Claim Upon Which Relief can be Granted and on the Basis of Qualified Immunity is **GRANTED IN PART** as detailed in this Opinion.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE